Robert M. McKINNEY, Plaintiff,

v.

GANNETT CO., INC., a corporation, and the New Mexican, Inc., a corporation, Defendants.

No. CIV–78–630 C.

United States District Court,
D. New Mexico.

April 11, 1983.

Memorandum Relating to First Amended Final Judgement June 13, 1983.

SUPPLEMENT TO MEMORANDUM
OPINIONS FILED MARCH 17,
1981 AND AUGUST 25, 1981

CAMPOS, Chief Judge.

*The Option Feature*

The option to McKinney to retake *The New Mexican* after a suitable time for a current evaluation is related, functionally, to the rescission remedy in two (2) very critical and important ways. One of these has been mentioned. It operates as a guarantee that Gannett will act toward *The New Mexican* in a responsible way during the evaluation period.

The other functional aspect of the option feature has not been as fully discussed or treated by me as, perhaps, it should have been. But the part it plays in the rescission scheme is integral. And it needs some discussion now so that all, including the Court of Appeals, may be fully advised as to the reason for its existence in the rescission remedy. This aspect relates directly to my decision not to allow McKinney "damages ancillary to rescission."

In the case of rescission of a simple sale of an object for a certain number of dollars, damages to the object during possession by the buyer might well be a desirable and necessary adjunct of complete equity when the sale is undone. But we do not have here the mere purchase and sale of a horse for a fixed number of dollars. The transaction here is vastly different. We are treating here with assets upon the value of which bear a myriad of forces. Those forces need not be identified here. It is sufficient to know that the values of *The New Mexican* and the Gannett common stock are not static. These forces and values are in constant kaleidoscopic change. And some of the changes in values have been wide-ranging and volatile. The characteristics which inhere in the litigated assets, taken together with Gannett's conduct, present a complex of equitable considerations which is unusual indeed.

The value of one of the objects of the trade, the *Gannett* common stock, is:

A. readily ascertainable, and

B. has been on a track of steady increase since February 1976. The market value of that stock has been:

1. February 26, 1976 (day prior to closing of transaction) $11,850,000.

2. September 1, 1978 (date suit filed) $14,250,000.

3. March 17, 1981 (date of first Memorandum Opinion) $18,112,500.

4. August 25, 1981 (date of judgment) $17,325,000.

5. April 8, 1983: $31,387,500.

On the other hand, the value of the other object of the trade, *The New Mexican,* is

C. not readily ascertainable, and

D. great diversity of opinion exists between the parties as to whether its value has increased or decreased since February 1976.

At trial, McKinney took the position that Gannett's policies had deteriorated the value of *The New Mexican* to the point it was then worth less than its value at the time of the transaction.

■ In an adversary proceeding the dollar determination of the worth of an operating newspaper is a difficult task at best. But engraft upon such a burden the additional one of determining what the value of that newspaper would have been had it been managed according to what McKinney contends would have been a more enlightened and the proper policy and we would have moved into a world of legalistic surrealism. "Damages ancillary to rescission," in the context of this case, was a morass to be avoided at all cost.

The option device, at conception, was designed to detour the necessity of the distasteful and all but impossible task of determining "damages ancillary to rescission." The device provided a functional alternative to McKinney's request that I enter an order of rescission and award him "damages ancillary to rescission."

If rescission was, or is, to be had at any time McKinney *must* return all that he has received in the transaction. This includes all of the Gannett stock. It is not equita-

bly possible to order rescission without this element. However, at all times since March 1981 the Gannett stock which must be returned has exceeded by many millions of dollars the amount *The New Mexican* was worth in February 1976. And, again, McKinney took the position that, at the time of trial, the newspaper was worth less than in February 1976. If McKinney were to avoid suffering a disastrous negative economic impact upon my ordering outright rescission, as he originally prayed, then it would have been absolutely incumbent upon him to prove, at the very least, "damages ancillary to rescission" in an amount equal to the difference between the allegedly deflowered and devalued *New Mexican* and the value of Gannett stock to be returned. Those values in March 1981, and the direction they have taken since, would have placed McKinney's economic interest at considerable risk. The remedy as prayed for could have been calamitous indeed. A straight order of rescission with "damages ancillary to rescission" may well have visited upon the wronged party additional and enormous melancholy. He could have lost enough millions of dollars to make many, many millionaires.

By extending McKinney the option to take, or not retake, after he evaluated the value of the asset he was retaking, in the context of the values as I thought they existed in March 1981, I felt I was according McKinney something at least as valuable as "damages ancillary to rescission." In the milieu of equitable components in the case in March 1981 I felt that the option feature was a reasonable functional alternative to "damages ancillary to rescission."

■ One further thought on McKinney's claim for rescission *and* "damages ancillary to rescission" and the further claim that these should have been decided by a jury. Firstly, rescission is an equitable remedy and one which is awardable in the discretion of the Court. I am of the opinion that the greater discretionary power is the one which empowers a grant of rescission. Depending on circumstances, and to make rescission an appropriate remedy,

a court of equity may, but need not, grant "damages ancillary to rescission." The latter is a lesser discretionary power included within the greater. If this is a correct appraisal of the equitable power of a court in regard to rescission then we need not reach the question as to whether a jury must determine "damages ancillary to rescission." The equitable remedy was fashioned without "damages ancillary to rescission" as an element in the remedy. Whether a jury must, or the Court may, measure such damages is a moot question in this case.

To have the Court, or a jury, render a measurement of "damages ancillary to rescission" and then afford McKinney the option to accept or reject a package comprised of rescission *and* "damages ancillary to rescission" was not appealing as an equitable proposition in this case. The platter of equity would have been heaped beyond capacity.

In short, the option feature of the equitable remedy I structured in this case would not have been a component in it had I decided McKinney should have "damages ancillary to rescission."

### Income Taxes

Reversal of the 1976 transaction of the parties in the manner which I have ordered has been structured to accomplish one basic and simple two-part purpose. That is:

1. Have Gannett return to McKinney everything McKinney would have had had McKinney continued his stock ownership in The New Mexican, Inc.

2. Have McKinney return to Gannett everything Gannett would have had had Gannett continued ownership of the Gannet common stock it traded McKinney for the common stock of The New Mexican, Inc.

One important aspect of the accounting on disengagement which must not be ignored is that parts 1 and 2 were, of necessity, undertaken without quantification of the income tax consequences to the parties upon reversal of the transaction. Early on, I outlined by letter the general direction the "unscrambling" would take. The parties, however, made no attempt whatever to provide me with expert opinion as to what income tax treatment the Internal Revenue Service might accord the parties on reversal of the transaction. I took it as assumed all around that income tax consequences were not to receive my attention on the disengagement. I was, thus, moved to order "unscrambling of the egg" without any factual basis for considering and determining income tax consequences as the yellow was separated from the white.

A gross or speculative view as to what may occur if the transaction is actually reversed in the manner I have ordered is that:

A. Gannett while returning pre-tax earnings (actually net before income tax) to The New Mexican will secure an income tax benefit (either a tax credit or a deduction) which may approximate in value the amount of taxes actually paid as a result of New Mexican earnings.

B. McKinney while returning to Gannett all dividends (actual and imputed) will secure an income tax benefit (either a credit or a deduction) which may approximate in value the amount of income taxes attributable to dividends paid by Gannett on stock transferred to McKinney in February 1976.

Conclusions A and B, or one or the other, may be totally erroneous. But, again, I was requested to fashion a rescission remedy without regard to income tax consequences. My focus, therefore, rested on accomplishment of parts 1 and 2 of the objective outlined above. I will repeat in this Supplement what I informed by letter of August 25, 1981.

In reference to Mr. Marshall's views expressed in his letter of August 24, 1981, I can state only that when faced with the problem of how rescission should be effected it was my thought that the parties should be placed in, as close as possible, the position in which each would find itself had there been no bargain. At no time was I blessed, or troubled, by the illusion that this objective could be achieved with mathematical exactitude. In this case it is just not

possible to roll the clock and calendar back with finely tuned precision. At all times, also, I have sought to avoid an order which would give either side unfair advantage. I have done this even when faced with the disrelish of either seeming to or actually changing prior rulings.

## MEMORANDUM RELATING TO FIRST AMENDED FINAL JUDGMENT

Plaintiff, Mr. Robert M. McKinney, (hereafter "McKinney"), has not, within time, exercised the election to rescind provided in the Court's Order of April 11, 1983. Rescission on the terms set by this Court will, therefore, not be ordered.

This Court turns, then, to an explanation of the First Amended Final Judgment which has been signed and filed today.

At hand are:

A. (1) McKinney's Brief on the Alternative Form of Judgment received April 29, 1983.

(2) Conditional Form of Judgment proposed by McKinney received May 19, 1983.

(3) McKinney's Reply Brief on the Alternative Form of Judgment received May 31, 1983.

B. (1) Mr. Brandt's letter of May 19, 1983.

(2) Gannett's proposed First Amended Final Judgment received May 20, 1983.

(3) Gannett's Memorandum Brief on the Alternative Form of Judgment filed May 20, 1983.

C. (1) Mr. Tucker's letter of May 23, 1983, received May 23, 1983.

(2) The New Mexican's Brief on the Alternative Form of Judgment.

## NO WAIVER BY McKINNEY

The positions of the parties are simple and straightforward.

McKinney asserts that the Employment Agreement of February 27, 1976, is:

(a) still in effect and that

(b) a portion of the period of its operation should be "tolled."

Gannett and The New Mexican contend the Employment Agreement came to an end sometime during the litigation.

McKinney's position is acceptable and equitable. Gannett's and The New Mexican's is neither.

█ Underpinning the position of Gannett and The New Mexican that the Employment Agreement has reached its end is the proposition that McKinney, at a point in the trial, waived or abandoned his rights under the Employment Agreement by moving forward with his claim for rescission of all agreements which constituted "the merger." On the surface, but only on the thinnest surface, is there any plausibility to this argument. Scratch the thin surface and the basic flaw in this position is at once, and unmistakably, revealed.

A waiver is a knowing and voluntary relinquishment of a known right. This is Hornbook law. From this basic proposition follows the next. If one waives or gives up Right A to acquire Right B, then Right A is forsaken upon acquisition of Right B. By the same elementary logic, if Right B is withheld then Right A is not relinquished.

In this case, McKinney was at all times prepared to relinquish A (his rights and privileges in the "merger," including those in the Employment Agreement) if, but only if, he received B. B consisted of a return to him of *The New Mexican together* with "damages ancillary to rescission." For reasons this Court has previously discussed in letters and memoranda, "damages ancillary to rescission" were denied McKinney. Whatever the quality of this ruling or whether there was, or was not, benefit to McKinney in this order is entirely beside the point. The salient fact is that McKinney did not receive from this Court that which he, all along, has vigorously requested in exchange for relinquishment of his rights in the agreements which constituted the "merger."

Had McKinney been awarded rescission within the framework of his request, this Court would not, for the shortest moment, hesitate in holding that he waived and relinquished all his rights and privileges under the Employment Agreement. Not having achieved rescission *and* "damages an-

cillary to rescission," it would, in this Court's opinion, be a gross injustice to rule that he waived the rights and privileges bargained for and to him in the Employment Agreement. This unfairness is magnified when one considers the basic reason underlying this litigation.

The jury found knowing and intentional violations by Gannett of McKinney's contractual rights. This Court has concurred wholeheartedly in these findings and has adopted them as its own.

The New Mexican's Brief on Alternative Form of Judgment transparently implies this Court should not "strain to find more benefits to confer upon Mr. McKinney" and then expressly and boldly charges this Court has done "all it can for Mr. McKinney and there is no authority nor reason for it to do more."

Memories should not be so short. While Gannett and The New Mexican yearn, it is certain, to make a clean break and walk off and away from a former friend, the pain of a continuing bond forged in a happier time must, so far as this Court is concerned, yet be endured.

That which brought on this litigation cannot be ignored. It cannot so blithely be set aside and forgotten. The outstanding and ugly reality is this: It was the perfidy of Gannett's hard chargers that forced this litigation. A finding of waiver against the background of Gannett's sorry machinations would stamp approval on the latter. This Court cannot, and will not, hand victor's laurels to Gannett in its campaign to get McKinney "off the masthead" in gross violation of obligations freely and solemnly assumed. A finding of waiver would amount to just that. This Court's sense of equity is not so jaded. It is not so blind or so insensitive. Gannett's conduct, as revealed in the trial of this case, may be acceptable in its executive suites or in the marketplaces in which it moves and trades. It is not acceptable in this, or any other, court of equity.

## TOLLING OF THE EMPLOYMENT AGREEMENT

■ The briefs of both The New Mexican and Gannett in arguing against "tolling" the Employment Agreement cite the familiar rule that a court should not remake the contracts of parties before it. This familiar and salutary rule has absolutely no room for application in this case. It is Gannett and The New Mexican, Inc., who have sought, and now seek, to change the contractual relationship of the parties. They seek a complete abortion of the Employment Agreement. This will not be ordered. However, a preservation of the rights and privileges bargained for and to McKinney is equitable and should, and will, be ordered. This can only be accomplished by extending the contract term by time equal to the period during which certain of McKinney's rights, privileges and perquisites under the Employment Agreement have been wrongfully denied him by Gannett.

There is ample authority for the tolling of the period of the operation of a contract where one party to the contract acts in such a way as to deny the other party the enjoyment of the latter's rights under an agreement. This equitable device is not unknown in the Tenth Circuit. Nor is it unknown to this Court.

Oil and gas leases are contracts. In a case before this Court the lessor brought suit to cancel leases. The lessor did not prevail in its effort to have the leases cancelled. This Court ordered a tolling of the terms of the leases. The period of the lease term in each lease was extended by a period of time equal to that time during which enjoyment of the lessees' rights under the leases was denied them because of lessor's act of bringing the litigation. Equitable tolling of the period of operation of a contract in these circumstances was approved by the Court of Appeals, Tenth Circuit. *Jicarilla Apache Tribe v. Cecil D. Andrus, et al.,* 687 F.2d 1324 (10th Cir. 1982).

The fact that, in this case, suit was filed by McKinney does not speak or work against the proposition that the tolling principle should be applied in his favor. Five times before suit was filed, Gannett

forcibly denied McKinney his clear rights under the Employment Agreement. The only trail left to McKinney was the one which led to the Courthouse. On September 3, 1978, after McKinney did what Gannett had forced upon him, initiated litigation, Gannett acting formally through the board of directors of The New Mexican voted to strip McKinney of his most essential and most precious rights under the Employment Agreement. The campaign to kick McKinney out, started before McKinney filed suit, was thus neatly capped. In these circumstances this Court finds that it should, and it will, order that the equitable tolling principle with an exception hereafter treated, be applied in favor of McKinney.

The September 3, 1978, resolution of the Board of Directors of The New Mexican, Inc., Gannett's men, "suspended" McKinney's "responsibilities" under the Employment Agreement (Plaintiff's Exhibit 243). "Responsibilities" was a euphemism employed by Gannett's men in the stead of "rights and privileges." Except for continuation of payment of McKinney's salary of $30,000.00 a year, he was stripped of all his rights and privileges under the agreement.

The date from which tolling will start is the date on which there occurred the first external and palpable manifestation that Gannett had launched its campaign to get McKinney "off the masthead." This was March 8, 1978, the date on which McKinney's man, Watkins, was terminated from employment. From this date on McKinney, except for receipt of salary, was effectively barred from enjoyment of his rights and privileges. Hence, the tolling period shall be the period starting March 8, 1978, and ending on the date judgment becomes final after appeal or otherwise. *See Jicarilla Apache Tribe v. Andrus, supra.*

In applying the tolling principle, continuation of payment of salary to McKinney presents a slight complication but certainly not one which is insurmountable. As pointed out in the brief filed by The New Mexican, Inc., since McKinney's salary has been paid during this litigation, it would be inequitable to extend the period during which McKinney should be paid his salary beyond the time contracted in the Employment Agreement. This contention is sensible. This Court will, therefore, refrain from ordering that the tolling principle be applied to the period during which salary must be paid. The judgment will thus provide that salary will be paid for the time period specifically provided in the Employment Agreement but that the time within which all other provisions of the Agreement shall be in effect shall be extended by a period of time equal to the tolling period.

SECTION 53-11-49, N.M.S.A.1978

■ Section 53-11-49, N.M.S.A.1978 provides:

Any officer or agent may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person removed. Election or appointment of an officer or agent shall not of itself create contract rights.

Counsel for the parties and perhaps even this Court have not addressed with any precision the relationship of § 53-11-49, N.M.S.A.1978 to the resolution of the Board of Directors of The New Mexican, Inc., of September 3, 1978.

The resolution provides:

Resolved: That the responsibilities of Robert M. McKinney under his employment agreement with the Corporation and the Corporation's By Laws be suspended during the litigation....

Counsel for The New Mexican argue that under § 53-11-49 "The New Mexican has the absolute right to remove Mr. McKinney...." As a legal proposition this thesis is certainly arguable where the officer or agent is appointed pursuant to contract since any removal "shall be without prejudice to ... contract rights." However, this issue need not be addressed in this case since the resolution does not attempt to *remove* McKinney as an officer or as an agent. In specific terms it merely *suspends* for the period of the litigation. In the context of this case, *removal* as officer

or agent is not congruent with *suspension* of "responsibilities."

Board action under this resolution in no sense equates with removal of McKinney as an officer or agent. Thus, it serves no useful purpose to argue what § 53–11–49 may or may not authorize since, to this Court's knowledge, no action has been taken by anyone in this case which constitutes removal or attempted removal of an officer or agent. And it is the subject of removal which the statute treats.

Further, the resolution of September 3, 1978, by clearest implication, contemplates a continuance of contract life after the litigation. Were one to accept the validity of the suspensive action attempted in the resolution, which this Court does not, it yet must be concluded that that action self-destructs at the end of the litigation. And this results by the very terms of the resolution.

The Court wishes to emphasize that it is not ordering specific performance in this case. It is merely declaring the continued existence of the agreement of the parties with an extension thereof. Whether Gannett will or will not choose to comply with its agreement is for it to decide. If its choice is not to abide by its agreement then it will again lie with McKinney to determine his course of action.

## SUMMARY

When executed, the overall term of the Employment Agreement was ten years. However, the agreement terminates should McKinney die or become disabled. McKinney is now over seventy years old. In 1976 his health was not of the quality he or his might have wished. This was one of the reasons for the merger with Gannett. This Court hopes and prays that McKinney will live many years beyond that time when he will last have enjoyed the fruit justly his under the Employment Agreement. But life does not go on forever. And already McKinney has been kept at bay for over five years. It would be the highest tragedy for all parties in the case if, through the deliberate and wrongful acts of one, the just fruit due the other would be forever denied him. Gannett is one of the great business corporations in this country. Its direction and movement are on the grand scale. Yet, some time may pass before it is presented another opportunity to perform more nobly than that which is presented to it in the judgment filed today; this is to erase the blemish by moving with alacrity and punctiliousness to honor and abide the terms and spirit of its bargain with McKinney.