## SECURITY FEDERAL SAVINGS AND LOAN ASSOCIATION OF ALBUQUERQUE; First Southwest Financial Services, Inc.; Clarence E. Ashcraft; and Allen L. White, Plaintiffs,

### v.

## FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION; Federal Home Loan Bank Board; Director, Office of Thrift Supervision, in his own official capacity and as Successor in Interest to Federal Home Loan Bank Board; Federal Deposit Insurance Corporation, in its own capacity and as Successor in Interest to Federal Savings and Loan Insurance Corporation; and Federal Savings and Loan Insurance Corporation Resolution Fund, Defendants.

### No. CIV 89–1358 JC/RWM.

United States District Court, D. New Mexico.

Nov. 5, 1991.

Reconsideration Denied July 27, 1992.

Gretchen Friedlander, Douglas Foster, Paul Fish, Modrall Law Firm, and Robert J. Muehlenweg, and Orlando Lucero, Poole Law Firm, Albuquerque, N.M., for plaintiffs.

Douglas C. Henson, U.S. Attorney's Office, Albuquerque, N.M., George O. Barnwell, FDIC Legal Div., Gary A. Orseck, Dept. of Justice, and Aaron B. Kahn, Randy W. Thomas, Harris Weinstein, and Thomas J. Segal, Thrift Supervision Office, Washington, D.C., for defendants.

## MEMORANDUM OPINION
## AND ORDER

CONWAY, District Judge.

THIS MATTER comes on for consideration of Defendant Director of the Office of Thrift Supervision's Motion to Dismiss and Defendant Federal Deposit Insurance Cor-

poration's Partial Motion to Dismiss (defendants' Motion to Dismiss), plaintiffs' Motion for Partial Summary Judgment, and Defendant FDIC's Objections to Magistrate's Order. The Court, having considered the motions, their accompanying memoranda, and the applicable law, having heard oral argument on the first two motions, and being otherwise fully advised in the premises, finds that defendants' Motion to Dismiss is well-taken in part and will be granted in part, plaintiffs' Motion for Partial Summary Judgment is well-taken in part and will be granted in part, and Defendant FDIC's Objections to Magistrate's Order will be denied as moot.

## I

Plaintiff Security Federal Savings and Loan Association of Albuquerque (Security Federal) is a federally chartered stock savings association. It was formed in 1985 by the merger of the previously existing, but financially troubled, Security Federal Savings and Loan Association of Albuquerque (Old Security) with New Security Federal Savings and Loan Association (New Security). Following the merger New Security adopted Old Security's name. .

Due to the impending failure of Old Security, the Federal Home Loan Bank Board (FHLBB) and the Federal Savings and Loan Insurance Corporation (FSLIC) were faced with either liquidating Old Security and paying off its depositors or finding new sources of capital. After determining that the latter course would be more cost effective, FSLIC entered into an Assistance Agreement with Old Security and plaintiffs First Southwest Financial Services, Inc. (First Southwest), Clarence E. Ashcraft, and Allen L. White (these three plaintiffs will be referred to collectively as "the Investors"). The Investors created New Security for the purpose of acquiring Old Security. To this end they contributed $6,000,000 in cash to New Security. That amount, however, was not sufficient to bring the merged institutions into solvency.

FSLIC agreed in the Assistance Agreement to several provisions which supplied the necessary additional capital. The two

relevant to this case provided that: 1) New Security could include as regulatory capital the outstanding amount of a $7,410,000 subordinated debenture which it would issue to FSLIC, until less than one year remained to maturity, and 2) FHLBB Resolution 85–887, which allowed New Security for purposes of reporting to FHLBB or FSLIC to use purchase-method accounting and to amortize any intangible assets thereby resulting by the straight-line method for a period not to exceed 35 years, would govern accounting for the transaction where the Resolution differed from generally accepted accounting principles (GAAP). The latter provision allowed the shortfall between Security Federal's liabilities and the market value of its tangible assets to be treated as an intangible asset called "goodwill," amortizable over a period of up to 35 years. At the time of the merger goodwill amounted to $12,567,436.

An additional feature of the Assistance Agreement required Security Federal to assign to FSLIC, on demand and in the form and manner required by FSLIC, any so-called "Acquired Association Claims." FSLIC was then to reimburse Security Federal for the value of these claims, as reflected on the books of Old Security immediately prior to the effective date of the merger. FSLIC requested this assignment in 1986.

Security Federal apparently operated profitably pursuant to the terms of the Assistance Agreement. Passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, however, significantly affected its financial position. Among other sweeping changes, FIRREA abolished FSLIC and FHLBB, establishing the Office of Thrift Supervision (OTS) to charter, supervise, and regulate all federally insured savings associations. Additionally, FIRREA required the Director of OTS (Director) to promulgate strengthened regulatory capital standards for the thrift industry, to become effective December 7, 1989. Specifically, thrift capital standards were to be no less stringent than those for national banks, FIRREA § 301, 103 Stat.

280, severely restricting use of goodwill as regulatory capital. Possible sanctions for failure of a thrift to meet the new regulatory capital standards include imposition of asset growth restrictions, issuance of a capital directive limiting use of thrift funds, and treatment of failure to meet capital requirements as an unsafe or unsound practice. Home Owners' Loan Act of 1933 §§ 5(t)(6)(A)(i), (t)(6)(B)(i)–(ii), (t)(6)(C), (s)(3), 103 Stat. 303, 307–08 (1989).

Following imposition of the new regulatory standards, OTS found Security Federal to be tangibly insolvent and imposed restrictions, including limiting the maximum loan amount to any one borrower to $500,000. By letter dated March 6, 1990, plaintiffs tendered ownership of Security Federal back to defendants and requested restitution. Defendants refused to accept the tender.

In their Amended Complaint plaintiffs allege that the Director's actions in disallowing treatment of intangible assets and, possibly, subordinated debenture as regulatory capital, as mandated by FIRREA, constitute a breach of the Assistance Agreement, failure of consideration, frustration of purpose, and an unconstitutional taking of property without just compensation. Plaintiffs also claim breach of contract and failure of consideration for failure of FSLIC and the Federal Deposit Insurance Corporation (FDIC), FSLIC's successor, to pay for expenses incurred by Security Federal in collecting on alleged Acquired Association Claims and for their alleged failure to compensate Security Federal for Acquired Association Claims it purportedly assigned to FSLIC. Plaintiffs pray, alternatively, for: 1) a decree rescinding the Assistance Agreement and all related agreements and providing restitution to the Investors; 2) judgment that the Assistance Agreement has been totally breached by defendants and an award of damages to the Investors and Security Federal; and 3) if the Assistance Agreement is found to remain in effect, damages in favor of Security Federal and damages in favor of the Investors for the diminished value of their investment, a declaratory judgment permitting Security Federal to offset interest and

principal payments due on the subordinated debenture by amounts owed by defendants for the Acquired Association Claims, a decree of specific performance enjoining defendants to comply with the terms of the Assistance Agreement, and relief in the nature of mandamus directing FDIC to give good faith consideration to Security Federal's request for assistance.

Plaintiffs notified the Court on May 17, 1991, that OTS had placed Security Federal in receivership with the Resolution Trust Corporation (RTC) as receiver. Accordingly, counsel for plaintiffs withdrew from representation of Security Federal, with new counsel entering for RTC. The Investors' counsel also informed the Court that they would not pursue Acquired Association Claims issues, as those claims were solely those of Security Federal. The Investors do continue the litigation to obtain rescission and restitution, however, viewing the appointment of RTC as receiver for Security Federal as merely effectuating their March 6, 1990, tender of Security Federal to defendants.

The Director and FDIC (collectively referred to as "the defendants") move for dismissal of Counts I–IV and VIII–X of the Amended Complaint on grounds that this Court lacks subject matter jurisdiction over the claims in these counts and that they fail to state claims upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Defendants label these counts as the "FIRREA Claims" in that plaintiffs base them on FIRREA's new capital requirements and the Director's regulations implementing those capital requirements. In these claims plaintiffs allege failure of consideration (Count I), frustration of purpose (Count II), unconstitutional taking of property (Count III), breach of the Assistance Agreement (Counts IV, VII, and IX), and seek relief in the form of mandamus compelling FDIC to consider Security Federal's application for open assistance (Count X).

Plaintiffs move for partial summary judgment, contending that they are entitled as a matter of law to rescission of the merger of Old Security with New Security

on grounds of failure of consideration or breach of contract and to restitution to the Investors of the $6,000,000 they contributed to the merger. Alternatively, if rescission is not granted plaintiff Security Federal moves for partial summary judgment on the issue of payment by FDIC for the alleged assignment of the Assigned Association Claims. As explained by plaintiffs,

> [i]f the Court orders rescission of this merger, it will not be necessary to rule on this second aspect of the partial summary judgment motion, for the simple reason that Security Federal would revert to the ownership by the Defendants, and they could decide for themselves whether or not they wish to honor their contracts with themselves.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment at 13.

As discussed above, Security Federal has been placed in receivership by the OTS. Additionally, counsel for the Investors, who brought this motion as representatives of and on behalf of all plaintiffs, have withdrawn from representation of Security Federal, Motion to Withdraw; Order (May 14, 1991), and "will no longer be pursuing the claims raised by Acquired Association Claims issues," Notice of Receivership at 1. Accordingly, the Court will deny as moot the motion for partial summary judgment in favor of Security Federal on the issue of the Acquired Association Claims.

## II

The Court will first address defendants' Motion to Dismiss insofar as the Director and FDIC contend that the Court lacks subject matter jurisdiction over the FIRREA claims. The Court will then consider the Investors' Motion for Partial Summary Judgment, concurrently addressing relevant portions of defendants' motion to dismiss the FIRREA claims for failure to state claims for which relief can be granted. Finally, the Court will address Defendant FDIC's Objections to Magistrate's Order.

## A

■ Defendants contend that this Court lacks subject matter jurisdiction over the FIRREA claims because they are not ripe and because they fall exclusively within the jurisdiction of the United States Claims Court. Whatever merit the ripeness argument may have had at an earlier time in these proceedings has been mooted by the subsequent actions of the Director. The Director has taken final action on the issue of application of the new capital regulations to Security Federal. He applied the FIRREA capital provisions to Security Federal, determined that the institution was insolvent, and appointed the RTC as receiver. Plaintiffs' FIRREA claims, therefore, are ripe for adjudication.

Defendants also maintain that plaintiffs' claim for relief in the nature of mandamus in Count X, requesting that FDIC be compelled to consider Security Federal's proposal for direct financial assistance, pursuant to Section 217 of FIRREA, is not ripe. Regardless of whether this claim was ripe at the time of defendants' motion, the Director's placement of Security Federal in receivership has rendered this claim moot, and Count X will be dismissed.

Defendants' final jurisdictional argument is that jurisdiction over plaintiffs' FIRREA claims lies exclusively in the Claims Court. Defendants contend that these claims fall within the ambit of the Tucker Act, 28 U.S.C. § 1491,[1] and that no other statute waives sovereign immunity in this Court.

The United States Court of Appeals for the Federal Circuit, to which all appeals for the granting or denial of a motion to transfer an action to the United States Claims Court are assigned, 28 U.S.C. § 1292(d)(4)(A), addressed and dismissed similar jurisdictional contentions in *Far*

---

1. Section 1491 provides in pertinent part:
   The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1).

*West Fed. Bank, S.B. v. Director, Office of Thrift Supervision*, 930 F.2d 883 (Fed.Cir. 1991). In Count IV of their complaint the *Far West* plaintiffs sought rescission of an agreement with FHLBB and FHLBB's regional bank, Federal Home Loan Bank of Seattle, and restitution of the recapitalization funds they had invested in Far West Federal Bank. The Director and FDIC's motion to sever and transfer Count IV to the Claims Court was denied by the United States District Court for the District of Oregon. *Id.* at 885. The Federal Circuit affirmed the district court on interlocutory appeal. *Id.*

As in the case before this Court, the government maintained in *Far West* that the claim for rescission and restitution was merely a disguised contractual claim for money damages, deriving from a contractual relationship, with jurisdiction thereby found only in the Tucker Act and exclusively in the Claims Court, pursuant to 28 U.S.C. § 1491(a)(1). *Id.* at 887–88. The circuit court held, however, that the claim may be brought in federal district court against the FDIC, pursuant to 12 U.S.C. § 1819(a), the agency's "sue and be sued" clause:

> [The FDIC] shall have power—
>
> .     .     .     .     .
>
> **Fourth.** To sue and be sued, and complain and defend, in any court of law or equity, State or Federal.

*Id.* at 888–89. The court found the "sue and be sued" clause to be the form of waiver of immunity from suit "most often employed in statutes that authorize a government agency to engage in commercial or business-related activity," *id.* at 888, with the large number of statutes containing such clauses reflecting congressional intent that "judicial remedy not be withheld when governmental agencies enter into transactions with the public," *id.* The court also cited numerous contract-related claims for monetary relief which have been brought under "sue and be sued" clauses and rejected defendants' contention that Congress intended in passing the Tucker Act to exclude contract claims from "sue and be sued" clauses in other statutes. *Id.* at 889. Furthermore, the court held that the suit was not converted to a suit against the United States, limiting jurisdiction to the Claims Court, merely because some funds under FDIC's control are provided by the Treasury. *Id.* at 890.[2]

The Federal Circuit also found waiver of immunity from suit in the district court with respect to the Director, pursuant to the "subject to suit" clause:

> Except as otherwise provided, the Director shall be subject to suit (other than suits on claims for money damages) by any Federal savings association or director or officer thereof with respect to any matter under this section or any other applicable law, or regulation thereunder, in the United States district court for the judicial district in which the savings association's home office is located, or in the United States District Court for the District of Columbia. . . .

12 U.S.C. § 1464(d)(1)(A). In so doing, the court did not find it necessary to address the merits of the government's position that the "subject to suit" clause, with its exception for "suits on claims for money damages," is a narrower waiver than a "sue and be sued" clause, requiring different jurisdictional treatment of the OTS. *Id.* at 891. Nor did the court address Far West's contentions that the claim for rescission and restitution in Count IV was not a claim for "money damages;" that it did not seek monetary relief from OTS; and that any monetary relief would be recovered from the FSLIC Resolution Fund, which had been unjustly enriched by abrogation of the Conversion Agreement. *Id.* Rather, the Federal Circuit determined that

---

**2.** Defendants present similar arguments in this case. This Court, however, agrees with the Federal Circuit. As the Supreme Court noted in *Larson v. Domestic and Foreign Commerce Corp.*, a case discussing sovereign immunity in the context of whether a suit is in fact a suit against the sovereign, regardless of who is named as defendant, "Congress has in many cases, entrusted the business of the Government to agencies which may contract in their own names and which are subject to suit in their own names." 337 U.S. 682, 705, 69 S.Ct. 1457, 1469, 93 L.Ed. 1628 (1949).

justice and efficiency would be served best by not severing this issue or party from the district court proceedings. *Id.* at 892. Thus, when viewed in light "of the congressional abhorrence of unnecessary burdens upon courts and litigants," the court held the "subject to suit" clause waived the Director's immunity from suit in the district court. *Id.*

Finally, the court refused to find that the claim for rescission and restitution was really against Congress and/or the United States, rather than the FDIC and Director.[3] *Id.* The court also found it unnecessary to decide whether Section 702 of the Administrative Procedure Act (APA) provides an independent waiver of immunity, as the "sue and be sued" and "subject to suit" clauses are sufficient to confer jurisdiction over the rescission and restitution claim. *Id.* at 892–93.

In accordance with the reasoning of the Federal Circuit in *Far West*, this Court finds that it has subject matter jurisdiction over this case pursuant to 12 U.S.C. §§ 1819(a)(Fourth) and 1464(d)(1)(A). As the Supreme Court stated in *Bowen v. Massachusetts:*

> It is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for more than $10,000.... That assumption is not based on any language in the Tucker Act granting such exclusive jurisdiction to the Claims Court. Rather, that Court's jurisdiction is "exclusive" only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court.

487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 2740 n. 48, 101 L.Ed.2d 749 (1988). The "sue and be sued" and "subject to suit" clauses grant federal district courts jurisdiction over FDIC and the Director. This is the case regardless of whether the Claims Court could also properly entertain plaintiffs' claim for rescission and restitution.

**3.** *See supra* note 2.

**B**

The Director and FDIC move for dismissal of the FIRREA claims for failure to state a claim for which relief can be granted. As grounds for their motion they assert that plaintiffs have no contractual right to restrict Congress' authority to legislate and that the breach of contract, failure of consideration, and failure of purpose claims are barred by the sovereign acts doctrine. Defendants also contend that the frustration of purpose doctrine is inapplicable to this case, that rescission is inappropriate, and that FIRREA capital standards are consistent with the Fifth Amendment, thus barring plaintiffs' takings claim. The Investors move for partial summary judgment on alternate grounds of breach of contract or failure of consideration with regard to the use of goodwill as capital and seek rescission of the merger between New Security and Old Security and restitution of the $6,000,000 they invested in Security Federal. As the Court finds plaintiffs' motion well-taken in part[4] and dispositive of their claims, defendants' motion will be discussed only to the extent it relates to the motion for partial summary judgment.

Summary judgment shall be granted if there is no genuine issue as to any material fact and if the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is tendered, however, the adverse party bears the burden of setting forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

■ The threshold inquiry of the Court is to determine whether there is any genuine factual issue that must be resolved by the finder of fact because it may reason-

**4.** Plaintiffs' motion will be denied as moot as to the Acquired Association Claims. *See supra* p. 1439.

ably be resolved in favor of either party. *Id.* In performing this duty, the Court must consider the evidence in the light most favorable to the nonmovant. *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1377 (10th Cir.1988). The Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is sufficient evidence favoring the adverse party so that a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

There is no genuine issue of fact as to the documents and events that are involved in this case. The relevant documents include the Assistance Agreement, FHLBB Resolution 85–887, and the FHLBB letter of October 4, 1985. There is also no dispute as to the fact that Security Federal was declared insolvent by the Director because it did not meet the capital regulatory standards required by FIRREA. Additionally, it is undisputed that the Director appointed RTC as receiver for the institution on May 17, 1991. Defendants do contest, however, whether plaintiffs' motion meets the standard for entry of summary judgment. They also contend that plaintiffs are not entitled to rescission of the Assistance Agreement on grounds that no contractual

remedy is available as a matter of law and because of certain alleged deficiencies in plaintiffs' statement of "Uncontested Material Facts."

Defendants' objection as to the failure of plaintiffs to enunciate the standard for entry of summary judgment is noted. It is, however, not determinative of the merits of the motion, and the Court certainly will not consider the omission grounds for denial of the motion.[5]

The Court also finds irrelevant defendants' contention that plaintiffs' "Uncontested Material Facts" Nos. 10 and 11[6] are not material for purposes of the motion. The Court agrees that these statements are not material and they have no bearing on the determination of this motion. The Court does not, however, see any need to deny plaintiffs' motion or continue consideration of it, pursuant to Fed.R.Civ.P. 56(f), pending lifting of the order staying discovery pending resolution of defendants' motion to dismiss. Defendants' contention that such ruling would be premature prior to discovery on the assertions in Uncontested Material Facts Nos. 10 and 11 and other unidentified facts is not convincing. Additionally, potential discovery as to purported knowledge on the part of plaintiffs for the

---

**5.** The Court notes in this regard that defendants failed to present the standard of review for a motion to dismiss for failure to state a claim for which relief can be granted, pursuant to Fed. R.Civ.P. 12(b)(6), in their 70 page Memorandum in Support of Defendant Director of the Office of Thrift Supervision's Motion to Dismiss and Defendant Federal Deposit Insurance Corporation's Partial Motion to Dismiss. Furthermore, in their response to plaintiffs' motion, defendants did not strictly comply with the local rules, which provide that:

A memorandum in opposition to the motion [for summary judgment] shall contain a concise statement of the material facts as to which the party contends a genuine issue does exist. Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies, and shall state the number of the movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted unless specifically controverted.

D.N.M.LR–Cv 56.1(b), para. 3.

**6.** These purportedly uncontested facts are:

10. Security Federal and its subsidiaries have in fact operated at a profit over the last 4½ years (the period from the date of acquisition through April 30, 1990). Its "insolvency" is the result of actions by Defendants OTS and FDIC, and it is not in fact "insolvent" in the normal and customary sense, inasmuch as its assets exceed its liabilities and it is able to pay its bills as they become due.

11. The inclusion of the goodwill in the capital account of Security Federal is vital, in that so long as OTS and FDIC brand Security Federal as insolvent, the maximum amount which can be loaned by Security Federal to any one borrower is $500,000. This limit effectively precludes Security Federal from engaging in its most stable and profitable line of business, which is the financing of the construction and purchase of new residential housing. Without being able to engage in that line of business, Security Federal will be unable to continue to operate profitably and will eventually become insolvent in fact. (De-Wald Affidavit, ¶¶ 12–14)

Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment 3–4.

potential risks in acquiring a savings and loan and determination on their parts to assume such risks, "including the risk that statutory and regulatory changes may impact upon the alleged contract," Defendants Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Declaration of Michelle Kosse para. 6, is irrelevant to the Court's analysis of the express terms of the documents themselves.

■ Turning to those documents, defendants do not contest that the Assistance Agreement is a contract among the parties. They do, however, argue that FHLBB Resolution No. 85–887 is not a contract and is not part of the Assistance Agreement. While the Court agrees that the Resolution may not be a contract in its own right, *cf. Flagship Fed. Sav. Bank v. Wall*, 748 F.Supp. 742, 748 (S.D.Cal.1990) (forbearance letter not a contract), it does not stand alone in this case.

Section 17(a) of the Assistance Agreement provides, in pertinent part, that:

This Agreement and the Subordinated Debenture, together with any interpretation or understanding agreed to in writing by the parties, constitute the entire agreement between the parties and supersede all prior agreements and understandings of the parties relating to the purchase of the Subordinated Debenture or other forms of assistance from the CORPORATION *except any resolutions or letters issued contemporaneously by the Bank Board or the CORPORATION....*[7]

(emphasis added). Additionally, Section 11 of the Assistance Agreement, "Accounting Principles," states in pertinent part:

Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, *except that where such principles conflict with the terms of this Agreement, applicable Federal regulations,*

*or any resolution or action of the Bank Board approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations, or such resolutions or action shall govern.* In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action. *If there is a conflict between such regulations and the Bank Board's resolution or action, such resolution or action shall govern.* For purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board ... or any successor organization of the American Institute of Certified Public Accountants ... respectively.

(emphasis added).

While it is true that the Assistance Agreement, dated October 3, 1985, does not directly address the issue of goodwill, the "contemporaneously issued" Resolution and FHLBB letter do. The Resolution is specifically referred to in the first Recital of the Assistance Agreement:

A. THE FEDERAL HOME LOAN BANK BOARD, by Resolution No. 85–887, dated October 2, 1985, has authorized the organization of NEW SECURITY FEDERAL SAVINGS AND LOAN ASSOCIATION....

Under the heading "Accounting" the Resolution provides

... That in accounting for the Merger, New Security shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified or interpreted by applicable regulations of the Bank Board and the FSLIC, *provided* that, for purposes of reporting to the Bank Board or the FSLIC, the value of any intangible assets on the books of New Security

---

7. A proviso concerning the Subordinated Debenture, which is not relevant to this case, completes the subsection.

resulting from accounting for the Merger in accordance with the purchase method may be amortized by New Security over a period not to exceed 35 years by the straight line method....

The FHLBB letter of October 4, 1985, echoes this provision:

> ... the following forbearances, waivers or authorizations are hereby granted and set forth:
>
> 1. For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the acquisition in accordance with the purchase method, may be amortized by Security of Albuquerque over a period not to exceed 35 years by the straight-line method.

The letter goes on to provide:

> This letter does not and shall not be construed to constitute forbearance or waiver by the [FHLBB or FSLIC] with respect to any regulatory or other requirement *other than those encompassed within the preceding paragraphs. Other than the action to enforce the regulatory requirements waived in accordance with the preceding paragraphs and the statutory provisions authorizing imposition of the waived requirements,* insofar as such requirements are waived, the Bank Board and the FSLIC expressly reserve all of their statutory rights and powers
> ...

(emphasis added).

It is clear that FHLBB Resolution 85–887 and the FHLBB letter of October 4th, are incorporated into the Assistance Agreement pursuant to sections 11 and/or 17. Whether the treatment of goodwill as regulatory capital technically qualifies as a form of "assistance" or is, rather, a part of the accounting method by which the transaction was conducted, *see Security Sav. and Loan Ass'n v. Director, Office of Thrift Supervision,* 761 F.Supp. 1277, 1281 (S.D.Miss.1991) (goodwill not included in Assistance Agreement because is not "assistance," rather was part of accounting method), it is also clear from the language of these documents that treatment of goodwill as regulatory capital is an express term of the overall contractual agreement, *see id.* at 1282–83 (absence of reference to goodwill in Assistance Agreement does not mean was not part of the transaction—it was an express term).[8] *See also Carteret Sav. Bank, F.A. v. Office of Thrift Supervision,* 762 F.Supp. 1159 (D.N.J.1991); *Hansen Sav. Bank v. Office of Thrift Supervision,* 758 F.Supp. 240 (D.N.J.1991); *Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision,* 746 F.Supp. 1042 (D.Or.1990); *Security Fed. Sav. Bank of Fla. v. Director, Office of Thrift Supervision,* 747 F.Supp. 656 (N.D.Fla.1990); *Sterling Sav. Ass'n. v. Ryan,* 751 F.Supp. 871 (E.D.Wash.1990), *modified in part,* No. CS–90–175–JLQ (Nov. 2, 1990) (1990 WL 261392) (limiting scope of injunction); *Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision,* No. Civ–2–90–166 (E.D.Tenn. July 16, 1990) (1990 WL 123145), *rev'd on other grounds,* 927 F.2d 1332 (6th Cir.1991). Furthermore, defendants in this case also explicitly waived application of regulations to the contrary and did not "expressly (or implicitly) reserve" any "statutory rights and powers" in regard to this forbearance. *See Carteret Sav. Bank,* No. 91–661, transcript of Order to Show Cause at 7 (D.N.J.1991) ("Federal agencies of course have the power to contract and with that goes the obligation to honor those contracts.... [Q]ualifying provisions regarding the impact of changes in law ... could easily have been included in the contract documents and weren't."); *Hansen,* 758 F.Supp. at 246–47 (favorably citing and quoting *Far West,* 746 F.Supp. 1042, for the proposition that "the sovereign waived its right to make legislative changes respecting these institutions and the contractual forbearances should be honored"); *Far West,* 746 F.Supp. at 1051 (finding

---

8. The *Security Sav.* court went on to state that "[e]ven if not an express undertaking of the government, it was certainly implicit that such treatment would be accorded goodwill." 761 F.Supp. at 1283–84 (citing and discussing *Winstar Corp. v. United States,* 21 Cl.Ct. 112

(1990), as finding "an enforceable implied in fact agreement by the government that goodwill would be amortized over an agreed period regardless of changes in GAAP or regulatory policy").

"nothing in the Conversion Agreement that could be construed as notice to plaintiffs that the deal could be called off if the government embarked on the path of a different regulatory scheme"); *Winstar Corp. v. United States*, 21 Cl.Ct. 112, 115 (1990) ("[T]he government expressly intended to contract for the particular treatment of goodwill at issue in this case, notwithstanding changes in GAAP or in the statutory scheme."); *cf. Guaranty Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 998–99 (11th Cir.1991) (assuming, without deciding, parties made contract, court found numerous express terms warning plaintiff that regulatory scheme might change to its detriment; plaintiff "took that chance"); *Flagship Fed. Sav.*, 748 F.Supp. at 748 (FHLBB specifically reserved right to cancel forbearance at any time if determined forbearance "unsafe or unsound or otherwise actually or potentially detrimental" to plaintiff).

■ Defendants, however, contend that plaintiffs have no contractual rights to restrict Congress' authority to legislate changes in the regulatory capital requirements and the only act they allege to effectuate a breach is the enactment by Congress of FIRREA and OTS's implementing regulations. In support of this position defendants quote *Bowen v. Public Agencies Opposed to Social Sec. Entrapment:*

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights and the concomitant duty to honor those rights, *see Perry v. United States*, 294 U.S. 330, 350–354 [55 S.Ct. 432, 434–436, 79 L.Ed. 912] (1935); *Lynch v. United States*, 292 U.S. 571 [54 S.Ct. 840, 78 L.Ed. 1434] (1934), we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 [102 S.Ct. 894, 907, 71 L.Ed.2d 21] (1982).

477 U.S. 41, 52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986) [hereinafter *POSSE*]. The Court goes on to state that " '[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' " *Id.* (quoting *Merrion*, 455 U.S. at 148, 102 S.Ct. at 907). Thus, "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Id.* (quoting *Merrion*, 455 U.S. at 147, 102 S.Ct. at 906).

Unlike the situation in *POSSE*, however, plaintiffs in this case do not seek, nor does this Court intend, a "decision effectively to forbid Congress to amend a provision of [an] Act." *Id.* Clearly there are "contracts to which the government must be bound, particularly when the government has received a benefit." *Winstar*, 21 Cl.Ct. at 116. In *POSSE* the Court specifically distinguished California's claimed right to terminate its participation in the Social Security System, notwithstanding subsequent congressional legislation to the contrary, from "an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see Lynch*, [292 U.S. at 576–77, 54 S.Ct. at 842]." 477 U.S. at 55, 106 S.Ct. at 2398. The Court further noted that the alleged contractual right in *POSSE* was not "a term over which the State had any bargaining power or for which the State provided independent consideration." *Id.*

The treatment of goodwill as regulatory capital was fundamental to the overall contractual agreement between the Investors and FHLBB and FSLIC. As numerous other courts also have recognized, the merger would have made no sense without this special treatment of goodwill, as the new institution would have been insolvent at its inception and no rational investor would have participated under those conditions. *See Winstar*, 21 Cl.Ct. at 115; *Charter Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 773 F.Supp. 809, 814 (W.D.Va.1991); *Carteret*, transcript of Order to Show Cause at 7; *Sterling*, 751 F.Supp. at 878; *Franklin*, slip op. at 2. Additionally, contrary to the situa-

tion in *POSSE,* policy considerations and the public interest actually may be furthered, not frustrated, by the ruling that FSLIC is bound by its contractual agreement as to goodwill. *See Winstar,* 21 Cl. Ct. at 116 ("[T]he court is convinced that at least part of the policy reflected in the prior and current regulatory schemes is a strong desire, if not need, on the part of the government to involve the private sector in rescuing failing savings and loans."); *Charter,* 773 F.Supp. at 827 & n. 2; *Security Fed. Sav. Bank of Fla.,* 747 F.Supp. at 660 ("[T]he public interest is best served by requiring the government to honor its obligations. This promotes certainty in the market and encourages private individuals and business entities to invest in regulated institutions."). For these reasons the Court agrees with the *Winstar* court that "[t]he fact that the government was free to change its regulatory scheme is not inconsistent with the possibility that there exists a contract here under which the government may have obligations to the plaintiffs...." [9] 21 Cl.Ct. at 116.

Defendants also assert that even if plaintiffs have contractual rights concerning the regulatory treatment of goodwill, the sovereign acts doctrine bars government liability. The Court does not agree. In *Horowitz v. United States* the Supreme Court gave its approval to the doctrine as set forth in *Jones v. United States,* 1 Ct.Cl. 383 (1865)—when the United States is sued as a contractor, it "cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." 267 U.S.

458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925). In further explaining the doctrine, the Court extensively quoted *Jones:*

"The two characters which government possesses as a contractor and as a sovereign cannot thus be fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.... In this court the United States appear simply as contractors; and they are *to be held liable only within the same limits that any other defendant would be* in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such *parties gain nothing by having the United States as their defendants.*"

*Horowitz,* 267 U.S. at 458, 45 S.Ct. at 344 (quoting *Jones,* 1 Ct.Cl. at 384) (emphasis added).

It is clear that the purpose of the doctrine is not to immunize the government from contractual liability whenever it legislates for the general welfare. Rather, its purpose is to assure that when the government acts as a contractor it is treated the same as any private contractor would be with respect to contractual liability. *See Wah Chang Corp. v. United States,* 282 F.2d 728, 734, 151 Ct.Cl. 41 (1960) (quoting *Jones,* 1 Ct. at 384–85). A plaintiff is not

**9.** The *Winstar* court preceded its conclusion with this discussion:

It is critical to this case, and apparently misconstrued by defendant, that plaintiffs are not claiming that the government contractually bound Congress not to change its regulations. Rather, plaintiffs claim that in their particular transaction with the government, it was agreed that they would be permitted to treat supervisory goodwill in a particular way for a fixed number of years. Thus, while Congress' power to regulate is not impaired, the government may be compelled to pay for the results of its actions, especially when in so doing the government actually is paying because it received a benefit. An analogy may be drawn to the corporate world, in which

under state law and a corporation's by-laws its board of directors' ability to act for the good of the shareholders may not be limited. Notwithstanding this prohibition, the corporation may be required to pay for its actions, such as firing an officer, although the legitimacy of its action is not questioned. With respect to government actions, an analogous situation may be found in the area of regulatory takings. Although Congress may exercise its police power and regulate extensively, in some cases when it does so it must provide just compensation if the result of the regulation effectively is to condemn a property right.
21 Cl.Ct. at 116 (citations omitted).

to gain "any advantage from having the Government as its defendant." *Id.* The doctrine "merely places the plaintiff on an equal footing" with parties who have contracts with non-government entities. *Id.* Therefore, to determine liability, " 'a citizen or corporate body must by supposition be substituted in * * * [the Government's] place, and then the question be determined whether the action will lie against the supposed defendant.' " *Id.* (quoting *Jones,* 1 Ct.Cl. at 385) (asterisks and brackets in original). Application of the doctrine will not save the government from liability "where it has specially undertaken to perform the very act from which it later seeks to be excused." *Freedman v. United States,* 320 F.2d 359, 366, 162 Ct.Cl. 390 (1963). Furthermore, while the government " 'cannot enter into a binding agreement that it will not exercise a sovereign power, ... it can say, if it does, it will pay ... the amount by which ... costs are increased thereby.' " *Wah Chang,* 282 F.2d at 735 (quoting *Gerhardt F. Meyne Co. v. United States,* 76 F.Supp. 811, 815, 110 Ct.Cl. 527 (1948)).

The sovereign acts doctrine is not a bar to plaintiffs' claim of breach of contract.[10]

In this case FSLIC and FHLBB specifically promised plaintiffs that they could account for goodwill as regulatory capital for a period of 35 years, expressly waiving application of regulations to the contrary. Defendants have breached this agreement [11] and are liable, as would be a private contractor.

Finally, rescission and restitution are appropriate remedies. *See McKinney v. Gannett Co.,* 660 F.Supp. 984, 1011 (1981), *modified,* 660 F.Supp. 1037 (D.N.M.1983), *aff'd,* 817 F.2d 659 (10th Cir.1987); *cf. Charter,* 773 F.Supp. at 827 (declaratory judgment that if defendants Director and FDIC place institution in receivership, plaintiff will have right to rescind contract). Furthermore, by appointing RTC as receiver, defendants now essentially control Security Federal and, thus, the means by which to restore the Investor's investment.

On the foregoing grounds plaintiffs' Motion for Partial Summary Judgment will be granted as to the claim of breach of contract. Plaintiffs' alternative ground for partial summary judgment, failure of consideration, will be denied as moot, as will

---

**10.** In *Charter* the court found that because defendants occupy the positions of both regulators and contractors, they control determination of whether performance will be made legally impossible, which would be the case if they placed plaintiff into receivership. 773 F.Supp. at 825. Were that to happen, the Court determined that plaintiff would have the right to rescind the contract. *Id.* The court found *Florida Power & Light v. Westinghouse Elec. Corp.,* 826 F.2d 239 (4th Cir.1987), analogous, although it involved a contract among private parties. In both cases the government

> pursued a policy that was intended to foster a private industry and encourage businesses to make contracts in reliance upon continuation of the policy. The policy in both cases was a key element that supported the purpose of the contracts. When a supervening law unexpectedly retracted that policy, the court concluded that the contract should be rescinded.

*Id.* at 826. The court did not find the fact that the government is both contractor and regulator distinguishable under *Horowitz. Id.*

**11.** Numerous courts have undertaken extensive analysis, with varying outcomes, of the question whether FIRREA abrogates contractual agreements as to regulatory treatment of goodwill,

but in the context of applications by the savings and loans involved for preliminary injunctions seeking to enforce their contracts. *See, e.g., Carteret,* 762 F.Supp. 1159 (statute, legislative history, and intent of Congress ambiguous; no clear intent to abrogate; distinguishes and declines to follow circuit decisions in *Franklin* and *Guaranty* ); *Far West,* 746 F.Supp. 1042 (FIRREA does not abrogate, § 401(g) saves); *Guaranty Financial v. Office of Thrift Supervision,* 742 F.Supp. 1159 (M.D.Ga.1990) (FIRREA does not abrogate, § 401(g) saves), *rev'd,* 928 F.2d 994 (assuming contract, did not prevent agencies from enforcing FIRREA as contained express language that warned regulatory scheme subject to future change; § 401(g) does not save; FIRREA ambiguous, but legislative history indicates intent to abrogate); *Franklin,* No. Civ–2–90–166 (FIRREA does not abrogate, § 401(g) saves), *rev'd,* 927 F.2d 1332 (FIRREA abrogates, § 401(g) does not save). Determination of whether FIRREA abrogates such agreements is not necessary in this case, as defendants here have completely breached their contractual obligation as to the treatment of goodwill, having declared Security Federal insolvent and appointed a receiver. As plaintiffs have noted, however, if § 401(g) saves agreements such as theirs, the sovereign acts doctrine is inapplicable as a defense.

be the remaining arguments in defendants' Motion to Dismiss.

### C

As plaintiff's Motion for Partial Summary Judgment will be granted in part and is dispositive of their claims, the Court finds it unnecessary to address Defendant FDIC's Objections to Magistrate's Order and it will be denied as moot.

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that:

1. Defendant Director of the Office of Thrift Supervision's Motion to Dismiss and Defendant Federal Deposit Insurance Corporation's Partial Motion to Dismiss be, and hereby is:

a. granted as to Count X of the Amended Complaint,

b. denied as to the issue of subject matter jurisdiction,

c. denied as to First Southwest Financial Services, Inc., Clarence E. Ashcraft, and Allen L. White's claim of breach of contract, and

d. denied as moot in all other respects;

2. Plaintiffs' Motion for Partial Summary Judgment be, and hereby is:

a. granted as to the claim of breach of contract and

b. denied as moot in all other respects; and

3. Defendant FDIC's Objections to Magistrate's Order be, and hereby is, denied as moot.

### ORDER

THIS MATTER is before me on defendants' Motion for Reconsideration of my Memorandum Opinion and Order of November 5, 1991. I have thoroughly reviewed the briefs and find no reason to reconsider my earlier decision. The defendants' Motion for Reconsideration will be denied.

IT IS SO ORDERED.