25 F.3d 1493
 63 USLW 2001
 RESOLUTION TRUST CORPORATION, as Conservator for Security
Federal Savings and Loan Association, F.A., Plaintiff,
First Southwest Financial Services, Inc., Clarence E.
Ashcraft, Allen L. White,
Plaintiffs-Appellees/Cross-Appellants,
v.
FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, Federal
Savings and Loan Insurance Corporation Resolution
Fund, Defendants/Cross-Appellees,
Federal Deposit Insurance Corporation, Federal Home Loan
Bank Board, Director, Office of Thrift Supervision, in his
own official capacity and as successor in interest to
Federal Home Loan Bank Board, Defendants-Appellants/Cross-Appellees.
 Nos. 93-2002, 93-2015 and 93-2016.
 United States Court of Appeals,
Tenth Circuit.
 June 13, 1994.
 
 Scott R. McIntosh, Attorney, Appellate Staff, Civ. Div., Dept. of Justice, Washington, DC, Teresa Scott, Attorney, Office of Thrift Supervision, Washington, DC (Carolyn B. Lieberman, Acting Chief Counsel, Thomas J. Segal, Deputy Chief Counsel, Aaron B. Kahn, Asst. Chief Counsel, Office of Thrift Supervision, Washington, DC, Stuart Schiffer, Acting Asst. Atty. Gen., Washington, DC, Don J. Svet, U.S. Atty., Albuquerque, NM, and Douglas N. Letter, Appellate Litigation Counsel, Dept. of Justice, Washington, DC, with them on the brief) for defendants-appellants and cross-appellees.
 Paul M. Fish (Allen C. Dewey, Jr. and Lisa Mann Burke with him on the brief), Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for plaintiffs-appellees and cross-appellants.
 Before MOORE and KELLY, Circuit Judges, and VAN BEBBER, District Judge.d
 PAUL KELLY, Jr., Circuit Judge.
 
 
 1
 The Federal Deposit Insurance Corporation (FDIC) and the Office of Thrift Supervision (OTS)[1] appeal summary judgment in favor of First Southwest Financial Services, Inc. and other investors in Security Federal Savings and Loan Association (Security Federal) on their breach of contract claim. Because the Agencies breached their agreement to treat supervisory goodwill and the value of a subordinated debenture as assets for regulatory purposes, we agree that the investors properly rescinded the agreement and thus are entitled to restitution. Our jurisdiction arises under 28 U.S.C. Sec. 1291 and we affirm.
 
 Background
 
 2
 Security Federal came under federal regulatory control in the 1980s. Rather than liquidate the association at a substantial loss to the Federal Savings and Loan Insurance Corporation (FSLIC), the regulators solicited First Southwest and two additional investors, Clarence E. Ashcraft and Allen L. White, (hereinafter collectively "the Investors"), to invest in and to operate a new savings and loan association, "New Security", as successor to Security Federal.
 
 
 3
 Under then applicable law, FSLIC and FHLBB had broad discretion in the use of accounting measures to facilitate mergers and acquisitions of savings and loan associations (S & Ls), 12 U.S.C. Sec. 1464(d)(11) (1982), as well as in enforcement of capitalization requirements, see 12 U.S.C. Sec. 1464(d)(1) (1982). Accounting for intangible assets created in the course of a merger or acquisition, such as supervisory and regulatory goodwill, assisted regulators in managing the burgeoning insolvencies and the ensuing liabilities of the FSLIC insurance fund. Both practices were departures from generally accepted accounting principles (GAAP). Accounting for supervisory goodwill allowed the S & L to treat unrealized losses as an intangible asset in order to comply with regulatory capitalization requirements, with amortization over a long period of time. This accounting treatment facilitated acquisitions of failing S & Ls and the necessary absorption of non-performing loans and overvalued collateral. Regulatory goodwill allowed the new S & L to record financial assistance from FSLIC as an intangible asset which also contributed to capitalization for compliance purposes. See H.R.Rep. No. 101-54(I), 101st Cong. 1st Sess. 302, reprinted in 1989 U.S.C.C.A.N. 86, 94.
 
 
 4
 Supervisory and regulatory goodwill played crucial roles in the acquisition of "Old Security," a mutual thrift institution owned by its depositors, by "New Security", a stock association owned by its investors. Unrealized losses--the excess of cost over the value of the assets at the time of New Security's acquisition--became $12.5 million of supervisory goodwill, amortized over 35 years. In addition, Old Security had a $7.4 million debt which it owed to FSLIC. New Security assumed this debt, which was restructured as a subordinated debenture with a ten year term. FSLIC and FHLBB then treated the amount associated with the debenture as regulatory capital as well.
 
 
 5
 The recapitalization was completed with a $6 million cash investment from the Investors, and a $14 million cash contribution from FSLIC. Nevertheless, without supervisory and regulatory goodwill, the capitalization would have fallen short of regulatory compliance by $6.5 million. See Affidavit of Phillip J. DeWald, Aplt.App. at 62.
 
 
 6
 The Investors' agreement to acquire the failing Security Federal and the Agencies' forbearance from GAAP necessary for the fledgling enterprise to succeed were memorialized in three documents: the Assistance Agreement, dated October 3, 1985; FHLBB Resolution 85-887, dated October 2, 1985, (FHLBB Resolution); and a letter to Security Federal from FHLBB, dated October 4, 1985, (FHLBB Letter). Security Federal then operated successfully from late 1985 until 1990. See Affidavit of Phillip J. DeWald, Aplt.App. at 62-63.
 
 
 7
 The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183 (1989), raised capital requirements and severely restricted the use of supervisory and regulatory goodwill, eventually phasing them out altogether. See 12 U.S.C. Sec. 1464(t) (1989). This change had disastrous ramifications for S & Ls such as Security Federal, whose successful operations depended, at least initially, on continued use of supervisory and regulatory goodwill for compliance with capitalization regulations.
 
 
 8
 On February 8, 1990, the Office of Thrift Supervision, successor to FHLBB, notified Security Federal by letter that it would apply the new FIRREA regulations to the S & L, and that OTS now considered Security Federal insolvent. In addition, OTS required Security Federal to infuse new capital and forbade it to make new loans, investments or to increase assets without OTS approval.
 
 
 9
 Shortly thereafter, on March 6, 1990, the Investors notified OTS that they were rescinding the agreement to acquire Old Security. They identified frustration of purpose, failure of consideration and breach of material terms of the agreement as bases for rescission. They tendered their stock in New Security to OTS and requested the return of their $6 million capital contribution. The Investors filed suit when OTS refused the tender, seeking rescission and restitution, declaratory and injunctive relief, damages, and mandamus relief directing FDIC to consider Security Federal's request for assistance.
 
 
 10
 In granting summary judgment on the Investors' breach of contract claim, the district court determined that no genuine issues of material fact existed between the parties. Security Fed. Sav. & Loan Ass'n v. FSLIC, 796 F.Supp. 1435, 1442 (D.N.M.1991). The court held that treatment of goodwill as regulatory capital was an express term of the overall contractual agreement. Id. at 1444. It determined that sections 11 and/or 17 of the Assistance Agreement incorporated the FHLBB Resolution and the FHLBB Letter. Id. The court reasoned that the supervisory goodwill treatment was fundamental to the agreement because the new institution was otherwise instantly insolvent, making the overall transaction senseless. Id. at 1445. The court noted that "no rational investor would have participated under those conditions." Id. Finally, the court observed that promoting certainty by holding the government to its bargain furthers the public interest by encouraging private investment in regulated industries. Id. at 1446. It held that OTS breached the 1985 agreement when it applied FIRREA's new regulations to Security Federal. Id. at 1447. Accordingly, the court ordered rescission and restitution.
 
 
 11
 We review de novo a grant of summary judgment and we apply the same legal standard used by the district court in evaluating the motion, namely Fed.R.Civ.P. 56(c). Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986)).
 
 I. The Investors as Parties
 
 12
 The Agencies argue that the Investors cannot state a claim for relief under the Assistance Agreement. According to the Agencies, the Investors are third-party beneficiaries whose rights are restricted by section 20 of the Assistance Agreement, which states that the agreement is for the sole benefit of FSLIC and New Security.
 
 
 13
 This argument appears somewhat akin to either a claim for dismissal under Fed.R.Civ.P. 12(b)(6), or an assertion that the Investors are not the real parties in interest under Fed.R.Civ.P. 17(a). Under either characterization, the Agencies waived the argument when they failed to raise it before liability was established. They did not file a motion to dismiss, raise the issue in a responsive pleading, nor raise it when the court considered the Investors' summary judgment motion on liability. Fed.R.Civ.P. 12(h)(2). Rather, they merely mentioned it at oral argument on the Investors' summary judgment motion for relief. Their interjection of the issue at such a late stage in the proceedings was untimely and constituted a waiver. Harris v. Illinois-California Express, Inc., 687 F.2d 1361, 1373-74 (10th Cir.1982) (citing Audio-Visual Marketing Corp. v. Omni Corp., 545 F.2d 715, 718-19 (10th Cir.1976)). The Agencies assert that they did not waive the issue because they raised it before the court entered an appealable order. Their reliance on Anderegg v. High Standard, Inc., 825 F.2d 77, 81 (5th Cir.1987), cert. denied, 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988), is completely misplaced, however, as Anderegg addresses a state parole evidence rule, not failure to raise an affirmative defense.
 
 II. Contract Construction
 
 14
 We begin with a determination of whether the parties entered into an agreement concerning treatment of supervisory and regulatory goodwill. The Agencies argue that the Assistance Agreement does not represent a contract concerning supervisory goodwill or other intangible assets. They assert that the FHLBB Resolution and the FHLBB Letter are not part of the Assistance Agreement, and, even if they are, these documents control accounting measures only for purposes of the Agreement, not for regulatory purposes. We find this attempt to narrow our focus to merely the Assistance Agreement, as well as to narrow the scope of the FHLBB Resolution and the FHLBB Letter, unpersuasive.
 
 A. The Agreement
 
 15
 The Restatement (Second) of Contracts Sec. 202 states that "[a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." See also Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 233 (2d Cir.1991) ("instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together"), quoted in Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir.1993). Phrases such as "incorporated by reference" are not talismanic, without which we do not consider additional necessary documents that effectuate the parties' agreement.
 
 
 16
 Contrary to the Agencies' position, we do not look only to the Assistance Agreement to determine whether the parties agreed on the use and treatment of supervisory goodwill and the subordinated debenture, in part because the Assistance Agreement itself refers to the FHLBB Resolution and the FHLBB letter. The Assistance Agreement specifically identifies FHLBB Resolution 85-887 as the controlling document authorizing the creation of New Security, its capitalization by its investors, its merger with Old Security, and its restructuring of debt owed to FSLIC. Assistance Agmt., Recitals p A, Aplt.App. at 70. Section 17(a) makes clear that the parties reduced their agreement to writing and that the writing includes contemporaneous resolutions and letters issued by FHLBB or FSLIC. Id., Aplt.App. at 100. Section 11 addresses accounting methods; it provides that GAAP applies unless concurrent documents supply a different method. Id., Aplt.App. at 96. It further designates those concurrent documents as controlling should a subsequent conflict arise between regulations and the documents. Id. The Agencies do not dispute that these three documents were issued contemporaneously; the Assistance Agreement, the FHLBB Resolution, and the FHLBB Letter were generated within three days of each other, each with the purpose of realizing the Security Federal acquisition. Hence, the Recital and the language of the Assistance Agreement's Secs. 17(a) and 11 explicitly direct us to the FHLBB Resolution and the FHLBB Letter.
 
 
 17
 Cross-references to the Assistance Agreement contained in the FHLBB Resolution and FHLBB Letter also support the conclusion that the Assistance Agreement relied upon the FHLBB Resolution and the FHLBB Letter. Several clauses in the FHLBB Resolution demonstrate that execution of the Assistance Agreement was an express condition of the FHLBB's issuance of a charter. See FHLBB Resolution 85-887, Recital, Aplt.App. at 105 ("WHEREAS, the Investors' acquisition of the Association and the Merger are conditioned upon the execution of an Assistance Agreement among the Investors, New Security, and the FSLIC, under which the FSLIC will provide certain financial assistance and indemnification to New Security to facilitate the Merger"); id., Chartering of New Federal Stock Association p 6, Aplt.App. at 108; id., Completion of Organization, Aplt.App. at 111. In addition, the FHLBB Letter unequivocally addresses the acquisition in its opening sentence. (Letter from FHLBB to New Security of 10/4/85, Aplt.App. at 120) ("In connection with the approval by the [FHLBB] of the acquisition of the assets and liabilities of [Old Security] by [New Security]...."). Moreover, the applicable regulations anticipated and allowed "such other provisions, agreements, or understandings as relate to the combination" to be considered part of a merger and/or acquisition agreement if the agreement referred to them. 12 C.F.R. Sec. 552.13(g)(xi) (1985). Here, the Assistance Agreement refers to the FHLBB Resolution and the FHLBB Letter, both of which relate to the acquisition. Therefore, when FHLBB deemed the agreement to be in substantial compliance with its contract regulation, FHLBB Resolution 85-887, Approval of Merger Agreement, Aplt.App. at 114 (citing 12 C.F.R. Sec. 552.13(g) (1985)), it deemed that all referenced documents pertaining to the acquisition were part of the parties' agreement. These numerous cross-references, together with FHLBB's view that the Assistance Agreement complied with 12 C.F.R. Sec. 552.13, show that these documents were executed concurrently to create one contract.
 
 B. The Accounting Measures
 
 18
 Having found that the Assistance Agreement incorporates the FHLBB Resolution and the FHLBB Letter, we address the Agencies' argument that the supervisory and regulatory accounting measures apply only to the acquisition but not to continuing operations or regulatory compliance.
 
 
 19
 The FHLBB Resolution establishes acceptable accounting methods when it states:
 
 
 20
 That in accounting for the Merger, New Security shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified or interpreted by applicable regulations of the Bank Board and the FSLIC, provided that, for purposes of reporting to the Bank Board or the FSLIC, the value of any intangible assets on the books of New Security resulting from accounting for the Merger in accordance with the purchase method may be amortized by New Security over a period not to exceed 35 years by the straight line method....
 
 
 21
 FHLBB Resolution 85-887, Accounting, Aplt.App. at 117-18 (emphasis added). The FHLBB Letter further states:
 
 
 22
 ... the following forbearances, waivers or authorizations are hereby granted and set forth:
 
 
 23
 1. For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the acquisition in accordance with the purchase method, may be amortized by Security of Albuquerque over a period not to exceed 35 years by the straight-line method....
 
 
 24
 Letter from FHLBB to New Security of 10/4/85, Aplt.App. at 120 (emphasis added).
 
 
 25
 We interpret unambiguous language as a matter of law. Valley Nat'l Bank v. Abdnor, 918 F.2d 128, 130 (10th Cir.1990); Restatement (Second) of Contracts Sec. 212 cmts. d & e (1981). The language here is wholly unambiguous. There can be no dispute that the supervisory goodwill and the subordinated debenture are intangible assets created by the merger. The Agencies' suggestion that "reporting" pertains only to the transaction at hand, and not to continuing operations and compliance requirements as well, is baseless on the record before us. Further, this assertion conflicts with a common-sense reading of the language. The government could easily have restricted the application of such accounting measures to the transaction had it wished to do so. We cannot torture the language to reach such a result.
 
 III. Breach of Contract
 
 26
 The Investors claim that OTS materially breached its agreement concerning regulatory capital when it notified New Security that FIRREA's new capital requirements applied. See Letter from OTS to New Security of 2/8/90, Aplt.App. at 122-23. A material failure of performance constitutes a breach that discharges the injured party from performance. Restatement (Second) Contracts Secs. 225(2), 237; 4 Arthur L. Corbin, Corbin on Contracts Sec. 946 (1951); accord Valley Nat'l Bank, 918 F.2d at 133. Such a breach "amount[s] to the non-occurrence of a constructive condition of exchange," E. Allan Farnsworth, Farnsworth on Contracts Sec. 8.16 (1990), and justifies the injured party's suspension of performance and termination of the contract. Id. Sec. 8.15.
 
 
 27
 The Agencies respond that OTS's enforcement of the FIRREA regulations cannot constitute breach as a matter of law under the sovereign acts doctrine. The sovereign acts doctrine operates to insulate the government from liability for certain inabilities to perform contractual obligations. More specifically, when the government enacts legislation of general applicability for the benefit of the general welfare and such legislation inadvertently affects the government's performance of a contract to which it is a party, the government cannot be held liable for damages resulting from its failure to perform any more than it would if it were an individual private party. Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925); Winstar Corp. v. United States, 994 F.2d 797, 808 (Fed.Cir.1993). This failure to perform cannot be thus characterized as a breach, but rather as an excuse of the government's contractual duty. Such immunity from liability balances the government's interest in the unencumbered legislation and administration of matters of general concern with the individual's interest in reliance on contracts entered into with the government in its proprietary capacity.
 
 
 28
 The bounds of the immunity afforded the government by the sovereign acts doctrine, however, are not limitless. The limits of this immunity are defined by the extent to which the government's failure to perform is the result of legislation targeting a class of contracts to which it is a party. If Congress enacts legislation targeted to abrogate pre-existing contract obligations the government owes to private citizens, the government may be properly sued for breach. See Perry v. United States, 294 U.S. 330, 350-54, 55 S.Ct. 432, 434-37, 79 L.Ed. 912 (1935) (invalidating legislation changing redemption terms of government bonds); Lynch v. United States, 292 U.S. 571, 580-583, 54 S.Ct. 840, 844-45, 78 L.Ed. 1434 (1934) (invalidating legislation repudiating government's obligation to pay insurance benefits to veterans).
 
 
 29
 To the extent that government agencies are given general legislative mandates that inadvertently abrogate pre-existing contractual obligations of the agency, the agency similarly will be immune from suit. However, if within such legislative mandate Congress provides the agency with discretion in enforcement because of Congress' awareness that prior agreements would be abrogated by an abrupt change in the law, the agency may properly be held in breach of any agreements which could have been honored by the exercise of the discretion afforded them by Congress. See Winstar, 994 F.2d at 809 n. 11 ("[T]he Sovereign Acts Doctrine may not be invoked where only particular contracts are the targets of legislation repudiating a government obligation to a specific party. The same would be true of agency action.") (emphasis added) (citing Everett Plywood Corp. v. United States, 651 F.2d 723, 732, 227 Ct.Cl. 415 (1981); Sun Oil Co. v. United States, 572 F.2d 786, 817, 215 Ct.Cl. 716 (1978)). If we find such agency discretion here, we need not reach the issue of whether Congress breached these types of assistance agreements in enacting FIRREA. Compare Winstar Corp., 994 F.2d at 809 (holding that Congress did not breach assistance agreement in enacting FIRREA because sovereign acts doctrine precluded agreement by which government forbears legislative power to amend statutes absent clear and unmistakable terms to the contrary) and Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 210-13 (4th Cir.1992) (same), cert. denied, --- U.S. ----, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993) and Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 617-24 (D.C.Cir.1992) (same) and Guaranty Fin. Serv., Inc. v. Ryan, 928 F.2d 994, 998-1000 (11th Cir.1991) (same) with Carteret Sav. Bank v. Office of Thrift Supervision, 963 F.2d 567, 581-84 (3d Cir.1992) (holding that Congress intentionally abrogated rights to use supervisory goodwill) and Security Sav. & Loan Ass'n v. Director, Office of Thrift Supervision, 960 F.2d 1318, 1323 (5th Cir.1992) (same) and Far West Fed. Bank v. Director, Office of Thrift Supervision, 951 F.2d 1093, 1097-98 (9th Cir.1991) (same) and Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision, 927 F.2d 1332, 1338-41 (6th Cir.) (same), cert. denied, --- U.S. ----, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991).
 
 
 30
 FIRREA's structure leaves little doubt that Congress well knew the crippling effects strengthened capital requirements would have on mergers that relied on supervisory goodwill, and that it attempted to mitigate these effects through various means. For example, section 1464(t)(3) tempers FIRREA's immediate effect by allowing thrifts to continue to meet the statute's core capital requirements through the use of limited supervisory goodwill during a phase-out period. 12 U.S.C. Sec. 1464(t)(3) (1989).
 
 
 31
 Most importantly, however, the statute expressly grants enforcement discretion to OTS through two mechanisms. First, section 1464(t)(7) allows the Director to exempt thrifts from sanctions for failing to meet the higher capital requirements under certain conditions. 12 U.S.C. Sec. 1464(t)(7) (1989). Second, and the analytical key here, section 1464(t)(8) permits the Director, until January 1, 1991, to exempt an institution completely from the revised capital standards. 12 U.S.C. Sec. 1464(t)(8) (1989). It was within this discretion that OTS acted on its contractual obligations with New Security in 1990.
 
 
 32
 It is undisputed that OTS refused to consider supervisory goodwill or apply regulatory accounting measures to Security Federal's capitalization requirements. In its February 8, 1990 letter, it "restat[ed its] position" that New Security was "tangibly insolvent and does not meet the regulatory capital requirements as prescribed by [FIRREA]." Letter from OTS to New Security of 2/8/90, Aplt.App. at 122-23. The OTS then instructed New Security to "not make any new loans or investments or increase assets without the prior written approval of the District Director," id., effectively hamstringing the institution. Because it was within the Director's discretion to allow continued use of regulatory accounting measures until January 1, 1991, OTS's refusal to abide by the contract's supervisory and regulatory goodwill terms constituted a breach of a contract term.
 
 
 33
 The issue now becomes whether those accounting treatments were material to the Investor's agreement to acquire the failing institution. Materiality depends on many factors, Zenith Drilling Corp. v. Internorth, Inc., 869 F.2d 560, 564 (10th Cir.1989), including whether the venture made sense absent the condition, whether it can survive the breach, and whether the possibility of cure exists. See Restatement (Second) of Contracts Sec. 241(a), (b) & (d). Whether the contract term allegedly breached was material to the contract is a mixed question of fact and law which can be resolved as a matter of law on summary judgment if reasonable minds cannot differ. Zenith Drilling, 869 F.2d at 563.
 
 
 34
 The Investors argue, and the district court agreed, that no rational investor would have acquired an insolvent institution and therefore the regulatory accounting treatment was fundamental to the agreement. We agree.
 
 
 35
 The benefit the Investors expected to receive when they agreed to acquire the failing Old Security was a solvent institution that passed regulatory muster. Without that threshold condition, there was no reason to invest capital and assume liabilities; potential profits would be financially meaningless and regulatory compliance impossible. See 12 C.F.R. Sec. 563.13(b)(2) (1985) (net worth requirement); see also Assistance Agreement Sec. 10(a), Aplt.App. at 94 (New Security required to maintain a three-percent net worth).
 
 
 36
 Uncontroverted record evidence establishes that without supervisory and regulatory goodwill, New Security would have debuted as an insolvent institution. See Affidavit of Phillip J. DeWald, Aplt.App. at 62, p 7 ("Had goodwill not been included in capital ... New Security would have had a deficit of $6,567,436 at its inception."). With the application of $12,567,436 of supervisory goodwill, id., New Security was rendered solvent and opened its doors. No evidence suggests that another solution--e.g., either the Investors or FSLIC putting up additional capital--was feasible or even considered by the parties. Thus, without supervisory goodwill, the nascent New Security was insolvent and the Investors would have been deprived of their expected benefit, a viable institution.
 
 
 37
 Two additional factors demonstrate the materiality of the supervisory goodwill terms. First, New Security became instantly insolvent when the government refused to apply supervisory goodwill in 1990. Second, any possibility of cure disappeared with the January 1, 1991, expiration of the government's authority to make exceptions to FIRREA's capital requirements. We conclude that the regulatory accounting treatments were material terms of the agreement between the Investors, and FSLIC and FHLBB, because supervisory goodwill provided necessary capital, the institution could not operate without it, and no possible cure exists. Therefore, OTS's failure to apply supervisory goodwill to New Security's capital requirements constituted breach of a material term of the Assistance Agreement and discharged the Investors from continued performance.
 
 IV. Frustration of Purpose
 
 38
 While the district court concluded its analysis based upon the breach of a material contract term, we note that the case also turns on frustration of purpose. We may affirm the district court's grant of summary judgment on any proper ground. Philippi v. Sipapu, Inc., 961 F.2d 1492, 1493 (10th Cir.1992).
 
 
 39
 A party may discharge a contract when its primary purpose has been destroyed by a supervening event that the parties assumed would not occur. Trustees of the Colorado Statewide Iron Workers (Erector) Joint Apprenticeship & Training Trust Fund v. A & P Steel, Inc., 812 F.2d 1518, 1523 (10th Cir.1987); Restatement of Contracts (Second) Sec. 265.
 
 
 40
 From the Investors' perspective, the primary purpose of the Security Federal transaction with FSLIC and FHLBB was to acquire and operate profitably a savings and loan association within the regulated thrift industry. In order to open New Security within regulatory guidelines, FSLIC and FHLBB agreed to recognize supervisory goodwill and to apply certain regulatory accounting methods. Assistance Agmt. Sec. 11, Aplt.App. at 96-97; FHLBB Resolution No. 85-887, Aplt.App. at 105, 115; Letter from FHLBB to New Security of 10/4/85, Aplt.App. at 120-21. In return, New Security agreed to maintain a three percent net worth, given the agreed upon capitalization standards. Assistance Agmt. Sec. 10(a), Aplt.App. at 94 (as long as the Investors control New Security, net worth will be maintained at 3%).
 
 
 41
 At the time of the agreement, FSLIC and FHLBB enjoyed broad discretion in formulating the net worth components. See 12 U.S.C. Sec. 1464(d)(11) (1982). To control that discretion, New Security exacted a promise from the Agencies to abide by the FHLBB Resolution and FHLBB Letter should their terms conflict with regulations concerning capitalization standards. Assistance Agmt. p 11, Aplt.App. at 96-97. This promise eliminated the Agencies' ability to change the capitalization rules on New Security, a development which may well have occurred given the 1985 statutory scheme. Both parties assumed that FSLIC and FHLBB would have discretion to vary capitalization requirements, thus they allocated the risk of change.
 
 
 42
 OTS argues that, after FIRREA, it had no choice but to refuse to include supervisory goodwill in the capitalization determination. While we disagree as noted above, the result does not change even if we assume OTS's argument is correct. Application of FIRREA's capitalization requirements to New Security made it impossible for the Investors to fulfill their contract duty to operate the thrift in compliance, thus totally frustrating their purpose and warranting discharge of their agreement to acquire the thrift. Cf. West Los Angeles Inst. for Cancer Research v. Mayer, 366 F.2d 220, 223 (9th Cir.1966) (frustration of purpose doctrine absolved performance where revenue ruling rejected the contract's tax premises), cert. denied, 385 U.S. 1010, 87 S.Ct. 718, 17 L.Ed.2d 548 (1967).
 
 V. Restitution
 
 43
 The Agencies argue that the district court had no legal or factual basis to award the Investors $6 million in restitution because their infusion of capital into Security Federal did not confer a benefit on FSLIC and FHLBB. Further, they argue that if the infusion conferred some benefit, it did not inure to FDIC. We disagree.
 
 
 44
 The purpose of rescission and restitution is to put the plaintiff in as good a position as it enjoyed before the contract was made by requiring the defendant to restore the value of plaintiff's part performance or reliance. Restatement (Second) of Contracts Sec. 370; see also 5 Arthur L. Corbin, Corbin on Contracts Secs. 996 & 1113 (1964). The Assistance Agreement provides ample legal basis to conclude that the Agencies benefitted from the Investors' acquisition of Security Federal. Under 12 U.S.C. Sec. 1729(f) (1982), FSLIC had authority to give substantial financial assistance to an S & L upon risk of default. Pursuant to this authority, FSLIC provided financial assistance to New Security because Old Security was "in danger of default and ... the amount of such assistance ... would be less than the losses the [FSLIC] would sustain upon the liquidation of [Old Security] through a receivership accompanied by the payment of insurance on accounts." Assistance Agmt., Recital p E, Aplt.App. 71-72 (emphasis added). This language demonstrates that FSLIC opted to structure a merger rather than liquidate specifically because it benefitted the agency.
 
 
 45
 The FHLBB Resolution further demonstrates that the Agencies solicited and authorized the acquisition in order to avoid liquidating Old Security. Under 12 U.S.C. Sec. 1464(p) (1982), FHLBB had authority to authorize the conversion of a mutual association to a stock association, but only if the mutual association was in severe financial trouble. In the recitals, the approval resolution states that "[t]he Director of the Office of FSLIC has proposed the incorporation and organization of New Security ... under ... 12 U.S.C. Sec. 1464(p) (1982), as part a plan to prevent the failure of [Old Security] and to resolve [its] financial difficulties...." FHLBB Resolution, Aplt.App. at 105 (emphasis added). In the chartering paragraph, the resolution further states: "[U]nder ... 12 U.S.C. Sec. 1464(p) (1982), and as part of a plan to prevent the failure of [Old Security], pursuant to a proposal by the FSLIC, the organization and incorporation of New Security ... is hereby approved...." FHLBB Resolution, Aplt.App. at 106 (emphasis added). In its Supervisory Conversion Findings, the Bank Board stated that:
 
 
 46
 "(1) [Old Security] is insolvent ...;
 
 
 47
 (2) The Bank Board has the power to appoint a receiver for the purpose of liquidating [Old Security];
 
 
 48
 (3) Upon the liquidation [and] payment of insurance on accounts, the members of [Old Security] would have no realizable equity interest ... apart from their claims for deposits ...;
 
 
 49
 (4) Pursuant to this Resolution, the FSLIC has contracted to provide assistance to [Old Security] under [12 U.S.C. Sec. 1729(f) ];
 
 
 50
 (5) Severe financial conditions exist which threaten the financial condition of [Old Security], and authorization of the supervisory merger-conversion ... is likely to improve its financial condition;
 
 
 51
 (6) Following the merger-conversion ..., the resulting association will be a viable entity."
 
 
 52
 Id., Aplt.App. at 112-13 (emphasis added). Read together, these resolution paragraphs show that, as a matter of law, the Investors' acquisition benefitted the Agencies by preventing the immediate failure and liquidation of Old Security.
 
 
 53
 The Agencies request a remand for a hearing on the appropriate amount of restitution. They suggest, without citing authority, that restitution should be the difference between prospective liquidation costs in 1985 and the actual liquidation costs they incurred when they closed New Security.
 
 
 54
 We find no such remand necessary. The measure of restitution depends on the circumstances of the case and is within the discretion of the trial court. Restatement (Second) of Contracts Sec. 371 & cmt. a; see also Restatement of Restitution Sec. 108. The district court's determination of restitution was founded on the undisputed fact that the Investors had infused $6 million into New Security. Summary judgment was properly granted so long as we find no abuse of discretion in reaching an amount based on undisputed facts. See Liberty Lobby, 477 U.S. at 251-52, 106 S.Ct. at 2511-12.
 
 
 55
 In a contract action seeking restitution, recovery may be measured as the reasonable value of what defendant received "in terms of what it would have cost him to obtain it from a person in the claimant's position," as justice requires. Restatement (Second) of Contracts Sec. 371(a). Here, the Agencies needed a $6 million capital contribution in order to avoid liquidating Old Security, which they solicited and obtained from the Investors. The fact that the Investors paid in capital to New Security rather than directly to the Agencies does not affect the Investors' right to restitution. See Restatement of Restitution Sec. 110 cmt. b (where promisor fails to perform, restitution is appropriate even though benefit was a transfer to a third party). Thus, the district court did not abuse its discretion in arriving at $6 million for restitution.
 
 
 56
 The district court ordered FDIC, as manager of the FSLIC Resolution Fund, to pay restitution from the Fund to the Investors. Aplt.App. at 177, 180-81. OTS's final challenge to the restitution award is that any recovery to which the Investors are entitled must come from the Resolution Trust Corporation (RTC), not the FDIC. This conclusion misinterprets FIRREA.
 
 
 57
 Before FIRREA, the FHLBB had broad regulatory powers over federal savings associations, 12 U.S.C. 1464(a) (1982), including supervisory authority over FSLIC, which provided deposit insurance, and its insured thrifts. 12 U.S.C. 1725(a) (1982). Congress considered this commingling of authority a source of many of the thrift industry problems because it contained an inherent conflict of interest. H.R.Rep. No. 101-54(I), 101st Cong., 1st Sess. 302, reprinted in 1989 U.S.C.C.A.N. 86, 98.
 
 
 58
 Under FIRREA, OTS became the primary federal regulator of federal and state savings associations, 12 U.S.C. Sec. 1462a(a), (e), 12 U.S.C. Sec. 1813(q), and FDIC assumed FSLIC's deposit insurance functions, 12 U.S.C. Sec. 1811. Both of these agencies succeeded to contract rights and obligations created by their predecessors. FDIC, however, specifically has management of the FSLIC Resolution Fund, 12 U.S.C. Sec. 1821a, which "is the successor to the existing reserves and assets, debts, obligations, contracts and other liabilities of the FSLIC," H.Rep. No. 101-54(I), 101st Cong., 1st Sess. 334, reprinted in 1989 U.S.C.C.A.N. 86, 130, which did not pass to the RTC. 12 U.S.C. Sec. 1821a(a)(2)(A); 12 U.S.C. Sec. 1441a(b). The RTC operates under limited authority solely to resolve FSLIC-insured thrifts declared insolvent between January 1, 1989 and July 1, 1995. 12 U.S.C. Sec. 1441a(b)(3). It is funded separately by the Resolution Funding Corporation, 12 U.S.C. Sec. 1441b(a).
 
 
 59
 After Congress enacted FIRREA, contract obligations to New Security resided with OTS, as successor to FHLBB, and FDIC, as successor to FSLIC. The Agencies' argument that restitution should be had from the Resolution Funding Corporation rather than the FSLIC Resolution Fund depends upon tracing the $6 million investment after OTS closed New Security. The owner of the contract obligations, however, rather than the final resting spot of the investment, determines the proper source for recovery.[2]
 
 
 60
 FIRREA also provides that "[a]ny judgment resulting from a proceeding ... initiated against [FDIC] with respect to [FSLIC] ... shall be limited to the assets of the FSLIC Resolution Fund." 12 U.S.C. Sec. 1821a(d); see also Far West Fed. Bank v. Director, Office of Thrift Supervision, 930 F.2d 883, 889-90 (Fed.Cir.1991) (FSLIC Resolution Fund is a source of recovery in a contract action against OTS and FDIC). Because FIRREA designates the FSLIC Resolution Fund as the successor to FSLIC rights and obligations and limits recovery to the Fund's assets, the Fund is the proper source of restitution to the Investors.
 
 VI. Prejudgment Interest
 
 61
 The district court denied the Investors prejudgment interest on the restitution award, citing Far West Fed'l Bank, S.B. v. Director, Office of Thrift Supervision, 787 F.Supp. 952, 962 (D.Or.1992) (FIRREA's waiver of sovereign immunity does not encompass prejudgment interest; FDIC fulfills a government function, it is not a profitable commercial insurance enterprise). The Investors maintain their claim warrants prejudgment interest because 1) FIRREA waived FDIC's sovereign immunity to prejudgment interest, 2) FDIC operates as a commercial entity, and 3) under New Mexico law, the Assistance Agreement allows for prejudgment interest in the event of rescission.
 
 
 62
 An award of prejudgment interest is within the district court's discretion. U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1255 & n. 43 (10th Cir.1988). We review de novo the district court's interpretation of federal law. Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 826 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993).
 
 
 63
 Generally, the United States is immune from interest on claims against it unless it has waived immunity or is operating as a private commercial enterprise. Sandia Oil Co. v. Beckton, 889 F.2d 258, 261 (10th Cir.1989) (citing Library of Congress v. Shaw, 478 U.S. 310, 317-18 & n. 5, 106 S.Ct. 2957, 2962-63 & n. 5, 92 L.Ed.2d 250 (1986) (applying strict construction of statutory waivers); Loeffler v. Frank, 486 U.S. 549, 555, 108 S.Ct. 1965, 1969, 100 L.Ed.2d 549 (1988) (applying liberal construction to agency commercial enterprises)). In Philadelphia Gear Corp. v. FDIC, 751 F.2d 1131, 1138-39 (10th Cir.1984), rev'd on other grounds, 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986), we held that because Congress anticipated delays in payments on claims for insurance proceeds without providing for prejudgment interest, 12 U.S.C. Sec. 1821(f), it did not waive FDIC's sovereign immunity under 12 U.S.C. Sec. 1819. FIRREA did not modify this rule when it placed FSLIC's functions under FDIC. See 12 U.S.C. Secs. 1813(c), 1821(a), (f).
 
 
 64
 Further, FDIC does not operate as a private commercial enterprise so as to subject it to prejudgment interest. As in Sandia Oil, FDIC more closely resembles the armed services death and disability programs in United States v. Worley, 281 U.S. 339, 50 S.Ct. 291, 74 L.Ed. 887 (1930), which provided military insurance at a government loss, than the self-sufficient and profitable commercial war risk insurance program at issue in Standard Oil Co. v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519 (1925). See Sandia Oil, 889 F.2d at 262-63. Through its deposit insurance and oversight authority, FDIC provides stability to the housing and financial industries, an important government function, currently at a loss to the Treasury. H.R.Rep. No. 101-54(I), 101st Cong., 1st Sess. 103, reprinted in 1989 U.S.C.C.A.N. 86, 103. Moreover, Congress sought to eliminate the conflict resulting from FHLBB's concurrent promotion and regulation of the S & L industry. Id. at 98. Thus, FDIC is not a commercial entity subject to prejudgment interest.
 
 
 65
 Neither does the Assistance Agreement provide a waiver. Nowhere does it address prejudgment interest on claims of breach, expressly or otherwise, and federal, not state, law controls. Shaw, 478 U.S. at 318 n. 6, 106 S.Ct. at 2963 n. 6. Therefore, the district court did not abuse its discretion by denying the Investors' claim for prejudgment interest.
 
 VII. Postjudgment Interest
 
 66
 The Agencies attempt to appeal the award of postjudgment interest for the first time in their reply brief. Generally, issues not pursued in the brief-in-chief are deemed abandoned and waived, Fed.R.App.P. 28(a)(3); Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1554 n. 6 (10th Cir.1992); 16 Charles A. Wright et al., Federal Practice and Procedure Sec. 3974, at 421 (1977 & Supp.1993, at 690) (issue must be raised in both the issues and argument section of the brief), therefore we will not address it.
 
 
 67
 The judgment of the district court is AFFIRMED.
 
 
 
 d
 The Honorable G.T. Van Bebber, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Collectively we refer to FDIC, OTS, and their predecessor agencies, the Federal Savings and Loan Insurance Corporation (FSLIC) and the Federal Home Loan Bank Board (FHLBB) as "the Agencies."
 
 
 [2]
 OTS's argument that the claim against it should be dismissed as moot also fails because OTS nevertheless possessed contract obligations to New Security even though the FSLIC Resolution Fund provides the source for restitution. We agree with the district court that OTS is an indispensible party. Fed.R.Civ.P. 19