48 F.3d 1231
 Pens. Plan Guide P 23909W
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Margaret T. BIAVA, personal representative of the Estate of
William E. Biava, Plaintiff-Appellee, Cross-Appellant,
v.
INSURERS ADMINISTRATIVE CORPORATION, an Arizona Corporation;
NN INVESTORS LIFE INSURANCE COMPANY, INC., also known as
PFL Life Insurance Company, an Iowa Corporation,
Defendants-Appellants, Cross-Appellees.
 
 1
 Nos. 94-2013, 94-2014.
 
 
 2
 United States Court of Appeals, Tenth Circuit.
 
 
 3
 March 1, 1995.
 
 
 4
 Before MOORE and BARRETT, Circuit Judges, and DOWNES*, District Judge.
 
 ORDER AND JUDGMENT[1]
 
 5
 Insurers Administrative Corporation (IAC), NN Investors Life Insurance Company, Inc., also known as PFL Life Insurance Company
 
 
 6
 (PFL), hereinafter collectively referred to as appellants, appeal from a judgment entered in favor of William E. Biava, appellee.[2] Biava cross-appeals from an order of the court denying his motion for attorney fees. A summary of the relevant facts follows.
 
 
 7
 Biava was president, chief executive officer, and director of Assaigai Analytical Laboratories, Inc. (Assaigai), a small family-owned New Mexico company, from October, 1985, until April, 1987. From April, 1987, until July, 1989, Biava worked at least 30 hours per week for Assaigai on marketing, diversification, and the acquisition of new business. Although Assaigai did not pay Biava a salary, it did pay for his work-related expenses and health insurance premiums. In January, 1989, Biava also received 1,350 shares of Assaigai stock for work he had performed.
 
 
 8
 In August, 1988, Assaigai established a plan of group health insurance for its eleven employees. IAC was the administrator of the plan and PFL was the underwriter for the group insurance provider. Insurance coverage extended to Assaigai's employees, defined as "person[s] directly employed and actively at work on a full-time basis of at least thirty (30) hours per week, in the regular course of business of, and compensated for services by, the Participating Employer [Assaigai]." (Appellants' Appendix, Tab 6 at 5). Assaigai paid 50% of the insurance premiums for each of its employees except Biava, for whom it paid 100% of the insurance premiums.
 
 
 9
 Biava's "eligibility for coverage under the plan was based on [his] application which was forged and submitted to IAC and PFL by their agents, Pat Corcoran and Eric Lane, stating that Biava was an active, full time employee of Assaigai working at least 30 hours per week and compensated at the rate of $5,000 per month." Id. at 2. Biava did not review or sign the forged application; he became a beneficiary under the plan based on the forged application. Id.
 
 
 10
 During December, 1988, and January, 1989, Corcoran and Lane were investigated by the New Mexico Superintendent of Insurance. Although IAC and PFL became aware that Corcoran's and Lane's insurance agency licenses were revoked due to fraudulent activity, they did not request new applications from Assaigai or its employees and they continued to accept the insurance premiums paid by Assaigai on behalf of Biava and other employees. Id. Assaigai's president, Biava's son, Assaigai's administrative manager, Biava's daughter-in-law, and Biava all understood and believed that Biava was covered by the plan. Id. at 4-5.
 
 
 11
 In 1989, Biava developed severe medical problems which resulted in his hospitalization at the University of New Mexico Hospital (Hospital) on July 7, 1989, and on several subsequent occasions. Prior to treating Biava, Hospital contacted IAC to verify that he was insured and that his anticipated treatment was covered. IAC advised Hospital that Biava was insured and that the anticipated treatment was covered. Biava executed a written assignment of his benefits under the plan to Hospital prior to receiving treatment. (Appellants' Appendix, Tab 10 at 4).
 
 
 12
 In March, 1990, IAC became aware that: Biava's hospital records indicated that he was retired; Biava was not listed as an employee on the quarterly unemployment tax returns filed by Assaigai with the State of New Mexico; and Biava was not listed as an officer or director of Assaigai in the articles of incorporation filed with the New Mexico State Corporation Commission.
 
 
 13
 On May 2, 1990, IAC advised Biava by letter that his coverage under the plan was rescinded as of August 1, 1988, the date the group policy was issued, based on the belief that he was not an employee as defined in the policy. In May, 1990, IAC attempted to refund to Assaigai the premiums it had paid on Biava's behalf. Assaigai refused to accept the refund. Assaigai continued to send IAC $238 per month to cover Biava's premiums through July, 1990.
 
 
 14
 After IAC refused to pay Hospital for Biava's treatment, Biava filed an action in state court. Appellants removed the action to federal district court, where Biava filed an action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001 et seq.
 
 
 15
 Following a two-day trial to the court, the district court entered judgment on February 2, 1993, in favor of Biava and against appellants in the amount of $100,560.12. The court reserved ruling on Biava's motion for attorney's fees, costs and prejudgment interest. On April 13, 1993, the district court entered a memorandum opinion and order denying Biava attorney's fees and costs and awarding him prejudgment interest at a rate of 15% per year pursuant to NMSA 56-8-4 (1978).
 
 
 16
 On July 20, 1993, the court entered an amended partial judgment superceding its February 2, 1993, judgment, wherein the court stated that the $100,560.12 awarded Biava under the February 2, 1993, judgment "... may not comport with the actual benefits payable under the terms of the plan." (Appellants' Appendix, Tab 9 at 1). The court reserved ruling on the monetary amount due and whether the award should be paid to Biava or directly to his medical care providers.
 
 
 17
 The court entered an amended judgment on December 10, 1993, in which it: awarded Biava judgment against appellants for benefits under the plan of $80,899.56; ordered that the $80,899.56 was to be disbursed directly to the medical providers; and ordered defendants to pay Biava prejudgment interest at a rate of 15% per year from May 2, 1990 on $80,899.56.
 
 
 18
 On appeal, appellants contend that the district court erred in concluding that Biava was eligible for benefits under the plan and in awarding prejudgment interest. Biava cross-appeals, contending that the court erred in refusing to award him attorney's fees.
 
 I.
 
 19
 Appellants contend that the district court's conclusion that Biava was eligible for benefits under the plan must be reversed.
 
 
 20
 An "employee" under Assaigai's plan was defined as:
 
 
 21
 ... a person directly employed and actively at work on a full-time basis of at least thirty (30) hours per week, in the regular business of, and compensated for services by, the Participating Employer [Assaigai].
 
 
 22
 (Appellants' Appendix, Tab 14 at 6).
 
 The plan also provided:
 
 23
 The insurance described herein is effective only if the individual is eligible for such insurance, premiums are paid to the insurance company on account of such individual and the individual becomes and remains insured....
 
 
 24
 Id.
 
 
 25
 In its amended memorandum opinion and order, the court found, inter alia: "[b]ecause it is undisputed that the plaintiff worked at least 30 hours a week, the only question is whether plaintiff was 'compensated for services' as those words are used in the plan," (Appellants' Appendix, Tab 6 at 6); "at issue here is whether Assaigai's payment of plaintiff's insurance premiums constitutes compensation under the terms of the plan," id.; "[a]lthough I am unable to find a clear answer in reported cases to the question, I conclude that, indeed, Assaigai's payment of plaintiff's insurance premiums constitutes compensation." Id. at 8.
 
 The court concluded:
 
 26
 Based on the understanding of Assaigai's personnel and of plaintiff himself, along with the fact that neither Assaigai's personnel nor plaintiff himself made any misrepresentations to defendants, and relying on the plain and ordinary meaning of the term 'compensation,' I conclude that when plaintiff was hospitalized in July 1989, plaintiff was an 'employee,' as defined by the plan.
 
 
 27
 Id. at 9.
 
 
 28
 Appellants contend that the court erred in these findings. Appellants argue that eligibility under the plan required both that a person be an employee, i.e., work at least 30 hours a week and be compensated for services, and further that Assaigai pay the person's insurance premiums. Appellants contend "[i]f premiums alone could satisfy the 'compensated for services' requirement, there would be no reason at all for that eligibility requirement because premiums must be paid for every participant." (Appellant's Opening Brief at 8). Appellants further contend that the ordinary meaning of "compensated for services" requires something more than the mere payment of premiums under the plan.
 
 
 29
 Biava responds that Assaigai's payment of his insurance premiums can satisfy both plan criteria of "compensated for services" and payment of insurance premiums. Biava argues that Assaigai paid for 100% of his insurance premiums, even though it was only required to pay for 50% thereof; although the plan defined 32 different terms in great detail, it did not define the term "compensated for services;" since the plan does not define "compensated for services," it should be given its ordinary meaning; the plain, unambiguous meaning of compensation is payment for services rendered; and "[f]urthermore, in those instances where Assaigai pays 50% of an employee's premium, it is also sending a check for the employees' contribution which comes out of the employees' compensation." (Appellee's Answer Brief at 9).
 
 
 30
 ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989). "We are mindful that the objective in construing a health care agreement, as with general contract terms, is to ascertain and carry out the true intention of the parties." McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1202 (10th Cir.1992). "[W]e do so giving the language its common and ordinary meaning as a reasonable person in the position of the HMO participant, not the actual participant, would have understood the words to mean." Id.
 
 
 31
 Biava was entitled to benefits if he was an "employee" under the plan for whom insurance premiums were paid. "In this circuit ... 'the determination of whether an individual is an employee [under an ERISA plan] is a question of fact,' ... [which] we therefore review under the clearly erroneous standard." Roth v. American Hospital Supply Corp., 965 F.2d 862, 865 (10th Cir.1992). "A court may ... consider the intent of the parties and their beliefs as to whether they have created the relation of employer and employee." Id. at 866. See e.g. Bartlett v. Marietta Operations Support, Inc., Life Ins. Plan, 38 F.3d 514, 519 (10th Cir.1994) (disabled employee who was placed on medical leave and hospitalized with a terminable disease and unable to return to work but continued to be shown as a regular full-time employee in the company's personnel records still considered "regular full-time employee" under plan).
 
 
 32
 In finding that Biava was an employee entitled to benefits under Assaigai's plan, the court found that Assaigai's payment of Biava's insurance premiums constituted "compensation for services" under the plan. The court's finding was not without precedent. In Newport News Shipbuilding & Dry Dock v. EEOC, 462 U.S. 669, 682 (1983), the Court, in construing the Pregnancy Discrimination Act amendments to the definition section of Title VII, 42 U.S.C.2000e, held that "[h]ealth insurance and other fringe benefits are 'compensation, terms, conditions or privileges of employment.' "
 
 
 33
 We hold that the district court's finding that Biava was an employee who was "compensated for [his] services" by Assaigai's payment of his insurance premiums and thus entitled to receive benefits under the plan was not clearly erroneous.
 
 
 34
 Moreover, Biava certainly had "reasonable expectations" of coverage,[3] inasmuch as: Biava's eligibility for coverage was based on a false and forged application submitted to appellants by their own agents, Corcoran and Lane; appellants did not request new applications from Assaigai after they became aware that the agency licenses of Corcoran and Lane were revoked for fraudulent activity; neither Assaigai's personnel nor Biava made any misrepresentations to appellants; appellants accepted Assaigai's insurance premium payments on behalf of Biava for over a year and a half without question; appellants told Hospital that Biava was insured and that his anticipated treatment was covered by the plan; Biava did not undergo any treatment until appellants assured Hospital that he was covered; ten months after assuring Hospital that Biava was insured and that his anticipated treatment was covered by the plan, appellants notified Biava on May 2, 1990, that he was not an eligible employee under their plan and that they were rescinding his coverage.
 
 II.
 
 35
 Appellants contend that the prejudgment interest award to Biava should be reversed or limited.
 
 
 36
 Biava argued in his post-trial motion that:
 
 
 37
 12. An award of prejudgment interest against an insurer is within the sound discretion of the Court. See, Rivera v. Benefit Trust Life Insurance Company, 921 F.2d 692 (7th Cir.1991) (award of prejudgment interest against insured on claim for benefit under group health insurance policy not an abuse of discretion). See also, Sweet v. Consolidated Aluminum Corporation, 913 F.2d 268 (6th Cir.1990).
 
 
 38
 13. The Court should look to state law in determining the rate of prejudgment interest. See, Dependahl v. Falstaff Brewing Corporation, 653 F.2d 1208 (8th Cir.1981). The rate at which judgments earn interest in New Mexico is 15% per year. Section 56-8-4 N.M.S.A.1978.
 
 
 39
 14. The Court has ruled that Biava is entitled to a judgment in the amount of $100,560.12. Biava was advised on May 2, 1990, that his coverage was rescinded as of August 1, 1988. Accordingly, Biava is entitled to prejudgment interest on $100,560.12 at the rate of 15% from July 7, 1989, the date on which Biava was admitted to the hospital. (Appellee's Appendix at 35-36).
 
 
 40
 The district court adopted Biava's arguments without elaboration, finding that "an award of prejudgment interest against an insurer is within the sound discretion of the court," (Appellants' Appendix, Tab 7 at 7), and "conclud[ing] that as a matter of equity, plaintiff should be paid prejudgment interest at a rate of 15% per year, NMSA 56-8-4 (1978)." Id.
 
 
 41
 Appellants contend that prejudgment interest is an equitable award that should not have been granted to Biava because: the district court found that appellants did not act culpably or in bad faith and both parties presented meritorious positions; appellants were not unjustly enriched and there was no evidence that appellants were enriched at all; and prejudgment interest awards act as a monetary penalty, which is not appropriate on any equitable grounds under the facts of this case.
 
 
 42
 Appellants also contend that: this case focused on the benefits available under a group health insurance policy that was issued for delivery in Alabama; the plan documents contained a choice of law provision that stated that the plan was to be governed by the law of the state of delivery; prejudgment interest is available under Alabama law at a rate of 6% per annum; and, in view of the express choice-of-law provision, any prejudgment interest awarded should not exceed the 6% rate available under Alabama law.
 
 
 43
 Biava responds that: the district court properly awarded prejudgment interest at 15% per annum; "prejudgment interest should be presumptively available to victims of federal law violation," Rivera, 921 F.2d at 696 (quoting Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 436 (7th Cir.1989)); "[a]ssuming that Alabama law governs, the contract to pay the medical services is to be performed in New Mexico. Under Alabama choice-of-law principles, interest is governed by the law of the place of performance. Alger-Sullivan Lumber Company v. Union Trust Company, 118 So. 760 (Al.1928) [note or bond made payable at a particular place with reference to laws of a particular state, is governed, in respect to its obligation as to interest, by law of place so stipulated as place of performance]; Cubbedge v. Napier, 62 Ala. 518 (Al. 1878) [where interest is expressly or impliedly to be paid upon contracts, the law of the place of where such contract is made, or the law of the place of performance, if such contracts are to be performed in a place other than that in which they are made, regulates and controls rate of interest]." (Appellee's Answer Brief at 11).
 
 
 44
 "The general rule under federal law for awarding prejudgment interest is that 'interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to consideration of fairness. It is denied when its exaction would be inequitable.' " F.D.I.C. v. Rocket Oil Co., 865 F.2d 1158, 1160 (10th Cir.1989) (quoting Board of Comm'rs of Jackson County v. United States, 308 U.S. 343, 352 (1939)). Prejudgment interest is appropriate when its award serves to compensate the injured party and its award is otherwise equitable. Overbrook Farmers Union v. Missouri Pacific Railroad, 21 F.3d 360, 366 (10th Cir.1994); In Re Investment Bankers, Inc., 4 F.3d 1556, 1566 (10th Cir.1993), cert. denied, ___ U.S. ___ (1994).
 
 
 45
 An award of prejudgment interest is within the district court's discretion. Resolution Trust v. Federal Savings & Loan Insurance Corp., 25 F.3d 1493, 1506 (10th Cir.1994). "We must uphold a district court's determination of prejudgment interest unless there is an abuse of discretion." Eastman Kodak Co. v. Westway Motor Freight, Inc., 949 F.2d 317, 321 (10th Cir.1991). State law governs prejudgment interest. Loft v. Lapidus, 936 F.2d 633, 639 (1st Cir.1991); Northrop Corp. v. Triad International Marketing S.A., 842 F.2d 1154, 1155 (9th Cir.1988). The award of prejudgment interest is considered proper in ERISA cases. See Lutheran Medical Center v. Contractors Health Plan, 25 F.3d 616, 623 (8th Cir.1994) (an award of prejudgment interest is necessary to allow an ERISA beneficiary to obtain appropriate equitable relief); Rivera, 921 F.2d at 696 (the presumption in favor of prejudgment interest awards is specifically applicable to ERISA cases).
 
 
 46
 Applying these standards, we hold that the district court's award of prejudgment interest pursuant to 56-8-4 NMSA (1978) did not constitute an abuse of discretion inasmuch as the award of prejudment interest served to compensate Biava and was not otherwise inequitable, Overbrook Farmers Union v. Missour Pacific Railroad, supra, and the rate of interest was in accord with Alabama case law that the place of performance regulates and controls the rate of interest.
 
 III.
 
 47
 Biava contends that the court erred in denying his motion for attorney fees.
 
 
 48
 Biava acknowledges, citing Moothart v. Bell, 21 F.3d 1499 (10th Cir.1994), that we review the district court's denial of attorney fees under an abuse of discretion standard, and that "[t]o hold that the district court abused its discretion, this Court must have a definite conviction that the trial court, upon weighing relevant factors, erred in its judgment." (Appellant's Brief-in-Chief on Cross-Appeal at 15). Biava further acknowledges that the relevant factors to be considered in determining whether attorney's fees are appropriate under ERISA include, but are not limited to, the five factors set forth in Gordon v. United States Steel Corp., 724 F.2d 106, 109 (10th Cir.1983), and reiterated in Moothart, 21 F.3d at 1507.
 
 
 49
 In considering Biava's motion, the district court found:
 
 
 50
 The Tenth Circuit has recognized that an award of attorney fees under this section [ERISA, 29 U.S.C. 1132(g)(1) ] is not done 'as a matter of course.' Gordon v. United States Steel Corp., 724 F.2d 106, 108 (10th Cir.1983). The court is to consider five factor when determining whether attorney's fees should be awarded under ERISA:
 
 
 51
 1. The degree of the opposing parties' culpability
 
 
 52
 or bad faith;
 
 
 53
 2. The ability of the opposing parties to per-
 
 
 54
 sonally satisfy an award of attorney fees;
 
 
 55
 3. Whether an award of attorney fees against
 
 
 56
 the opposing parties would deter other from
 
 
 57
 acting under similar circumstances;
 
 
 58
 4. Whether the parties requesting fees sought
 
 
 59
 to benefit all participants and beneficiaries
 
 
 60
 of an ERISA plan or to resolve a significant
 
 
 61
 legal question regarding ERISA; and
 
 5. The relative merits of the parties
 
 62
 positions. Gordon, 724 F.2d at 109. Firstly, I find that the defendants did not act culpably or in bad faith. Secondly, I have been presented with no evidence concerning defendants ability to pay plaintiff's attorney's fees; plaintiff's inability to pay is irrelevant. Thirdly, I do believe that an award of attorney's fees would deter others from applying such a rigid definition of compensation under an ERISA plan; however, this was a rather unusual case which will not likely occur often in the future. Fourthly, I do not consider plaintiff's actions to be of significant benefit to other participants, nor to resolve significant legal questions regarding ERISA. Finally, both parties presented meritorious positions as this was a close question indeed. Therefore, I conclude that plaintiff should not be awarded attorney's fees or costs. (Appellants' Appendix, Tab 7 at 7).
 
 
 63
 We hold that the district court properly applied Gordon in denying Biava's motion for attorney fees and did not abuse its discretion.
 
 
 64
 AFFIRMED.
 
 
 
 *
 The Honorable William F. Downes, United States District Judge for the District of Wyoming, sitting by designation
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 Biava is deceased and his estate is now the real party in interest
 
 
 [3]
 See Saltarelli v. Bob Baker Group Medical Trust, 35 F.3d 382, 387 (10th Cir.1994) ("We hereby adopt the doctrine of reasonable expectations [courts will protect the reasonable expectations of insureds regarding the insurance coverage afforded by insurance carriers] as a principle of the uniform federal common law informing interpretation of ERISA-governed insurance contracts.")